**2023 IL 127273**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127273)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ROBERT M. CLARK, Appellant.

*Opinion filed February 2, 2023.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville and Holder White concurred in the judgment and opinion.

Justices Cunningham, Rochford, and O'Brien took no part in the decision.

**OPINION**

¶ 1    On December 13, 1993, defendant, Robert M. Clark, pled guilty but mentally ill to one count of first degree murder and one count of robbery. At the time he committed these offenses, he was 24 years old and suffered from mental impairments including antisocial personality disorder, borderline personality

disorder, and fetal alcohol syndrome. The Knox County circuit court sentenced defendant to 90 years of imprisonment for the first degree murder conviction and a consecutive 15-year prison sentence for the robbery conviction, resulting in an aggregate sentence of 105 years of imprisonment.

¶ 2        This appeal concerns whether the circuit court properly denied defendant's motion for leave to file a successive postconviction petition. Defendant seeks leave to file a successive postconviction petition in order to challenge the constitutionality of his 90-year sentence for first degree murder, maintaining that the 90-year sentence offends the constitutional principles embodied in the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Specifically, defendant argues that his 90-year sentence is the functional equivalent of a life sentence and is unconstitutional because the circuit court failed to give sufficient weight to the characteristics of his intellectual disabilities and his young age as mitigation factors weighing in favor of a lesser sentence. The circuit court denied defendant's request for leave to file, concluding that defendant cannot meet the requirements of the cause-and-prejudice test for filing a successive postconviction petition. The appellate court affirmed the circuit court's judgment. For the following reasons, we affirm the circuit and appellate courts' judgments.

¶ 3                                I. BACKGROUND

¶ 4        On February 15, 1993, defendant entered the apartment of Nona B. Catlin in Galesburg, Illinois, with the intent of committing robbery. Defendant was 24 years old; Catlin was 89. When Catlin confronted defendant inside her apartment, he killed her by cutting her throat from ear to ear with a sharp object. He then took cash and other items from the apartment. At the time defendant committed these crimes, he suffered from several mental disorders, including antisocial personality disorder, borderline personality disorder, and fetal alcohol syndrome. Defendant had an intelligence quotient (IQ) of 79 and the intellectual ability of a 13- or 14-year-old.

¶ 5        The State and defendant agreed to a partially negotiated plea where defendant agreed to plead guilty but mentally ill to first degree murder and robbery. In exchange, the State agreed to dismiss an aggravated robbery charge and aggravated arson charges stemming from fires defendant started while being held in the county

jail before trial. The State also agreed not to pursue the death penalty but stated that it would seek a sentence of natural life in prison. The circuit court accepted defendant's plea and conducted the sentencing hearing on February 11, 1994. At the sentencing hearing, the circuit court heard and considered testimony from nine witnesses, including four mental health professionals who testified extensively about defendant's mental impairments.

¶ 6    The testimony at the sentencing hearing established that defendant's mother drank heavily while she was pregnant with defendant, sometimes to the point of passing out. She was intoxicated the day she gave birth to defendant. Defendant was taken from his natural family and placed with an adoptive family when he was four months old due to his parents' abuse and neglect. However, defendant's home life with his adoptive parents was also chaotic and abusive. Defendant's adoptive father was an alcoholic who was verbally and physically abusive. On one occasion, defendant defended himself from his adoptive father's physical abuse by breaking the father's jaw with a baseball bat.

¶ 7    Dr. James Tiller, a psychologist, began counseling defendant in 1981 when defendant was 11 years old. Dr. Tiller diagnosed defendant with "conduct disorder, undersocialized aggressive," which was a diagnosis for children with characteristics similar to those of adults diagnosed with antisocial personality disorder. The specific diagnosis of fetal alcohol syndrome did not exist in 1981, but Dr. Tiller explained at defendant's sentencing hearing that defendant's diagnosis involved features associated with fetal alcohol syndrome. Dr. Tiller further explained to the sentencing court that, if a child suffering from fetal alcohol syndrome lives in an abusive home, it becomes more difficult for that child to develop planning and social skills as well as impulse control. He explained that it is much more difficult for children with conduct disorder, such as defendant, to remediate in a chaotic or abusive environment.

¶ 8    The evidence at the sentencing hearing established that as a child defendant had considerable behavioral problems that continued as defendant became older, which led to court interventions and placements in a variety of special education programs. Defendant had difficulty controlling his behavior and, as a juvenile, committed criminal acts that included burglary and arson. Defendant was physically abusive against the staff of a children's home where defendant resided for a period.

¶ 9    Defendant left the children's home in September 1986 when he was 17 and was subsequently arrested for multiple offenses, including criminal damage to property, criminal trespass to a residence, illegal consumption of alcohol, driving without a license, and leaving the scene of an accident involving an injury. As an adult, defendant continued to drive without a license and committed offenses that included theft, residential burglary, and disorderly conduct by firing an air rifle. When defendant murdered Catlin, he was on parole for a prior residential burglary conviction.

¶ 10    Psychologist Dr. Charles Farrar testified at the sentencing hearing that he evaluated defendant on two occasions, once in 1989 when defendant was 21 years old and again in 1992 when defendant was 23 years old. The evaluations were for purposes of determining whether defendant qualified for Social Security disability benefits. Dr. Farrar testified that he diagnosed defendant with borderline intellectual disability,[1] alcohol dependency syndrome, and antisocial personality disorder. Dr. Farrar estimated that defendant's IQ was somewhere between 72 and 78 and that defendant had the intellectual ability of a 13-year-old. In addition, Dr. Farrar believed that defendant was chemically dependent in that defendant abused alcohol and other drugs, which created "considerable difficulties" in defendant's life.

¶ 11    Dr. Farrar observed that defendant was unable to get along with coworkers and supervisors during periods of employment. He concluded that, due to defendant's antisocial personality disorder, defendant was unable to hold steady employment. Dr. Farrar opined that little could be done for defendant's borderline intellectual disability and that the prospect for alcohol treatment for defendant was bleak because of defendant's low intelligence. Dr. Farrar also believed that it was "virtually impossible" to change the personality of someone with an antisocial personality disorder. He opined that people with borderline mental disability have

---

[1]Testimony from the circuit court proceedings, at times, includes the terms "mental retardation" and "mentally retarded." Illinois has replaced those phrases throughout state law with the terms "intellectually disabled" and "intellectual disability." See Pub. Act 97-227, § 1 (eff. Jan. 1, 2012); *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 143. Accordingly, we refer to defendant's condition as intellectual disability or intellectually disabled rather than mental retardation or mentally retarded. See *People v. Coty*, 2020 IL 123972, ¶ 4 n.3; *People v. Smith*, 2019 IL App (3d) 160631, ¶ 21 n.1

a "great deal of difficulty being able to learn." Dr. Farrar explained that defendant "tends to be exceptionally explosive so he will need some kind of custodial care."

¶ 12 Psychologist Dr. Eric Ward testified at the sentencing hearing that defendant had the intellectual skills of someone who was 14 years old, the interpersonal skills of a 7-year-old, the expressive ability of a 6-year-old, and the empathy of a 3-year-old. Dr. Ward testified that his testing revealed defendant's IQ to be 79, placing defendant in the "borderline level of intelligence." Dr. Ward believed that defendant should be treated with medication for attention deficit hyperactivity disorder to help with defendant's concentration and impulse control. Dr. Ward explained that defendant responded poorly to discipline and other corrective techniques. He opined that the prognosis for people with severe fetal alcohol syndrome was poor and, therefore, he believed that defendant's prognosis was poor.

¶ 13 Psychiatrist Dr. Robert Chapman testified at the sentencing hearing that defendant suffered from multiple mental disorders that could be neither cured nor treated to substantially minimize their effects. He diagnosed defendant with antisocial personality disorder, borderline intellectual disability, borderline personality disorder, and fetal alcohol syndrome. Defendant's borderline personality disorder was "characterized by a pattern of intense and chaotic relationships with emotional instability, fluctuating and extreme attitudes toward other people, impulsarity [*sic*], directly and indirectly self-destructive behavior, and a lack of clear or certain sense of identity[,] life plan[,] or values." According to Dr. Chapman, defendant demonstrated "impulsiveness, emotional instability, inappropriate intense anger, lack of control of anger, history of recurrent suicide history and behavior, and recurring chronic feelings of emptiness and boredom."

¶ 14 Dr. Chapman expected defendant's "pattern of intense anger, explosive behavior and violence" to continue indefinitely, as defendant had great difficulty learning from his experiences. Dr. Chapman testified that, for the protection of defendant and others, the most appropriate environment for defendant was one in which defendant is in a "protected state" and not free in society. He testified that "probably the treatment that would be the most effective" was treatment where defendant is "restrained or restricted from harming himself or others, however, others more importantly." Dr. Chapman opined that a prison psychiatric unit was the most appropriate setting for defendant.

¶ 15    The State presented testimony from jail personnel who described defendant's disruptive behavior at the jail during pretrial custody. Defendant's behavior included ripping a light fixture from the ceiling and using it to damage a door and bulletproof glass in the door. Defendant destroyed the locking mechanisms on several pairs of handcuffs, attempted suicide with a razor blade, had to be sprayed with Mace on occasions, and threatened to kill corrections officers and to do as much damage to the jail as he could. Defendant cut himself, requiring transport to a hospital, where he became irate and tried to escape. Defendant bit a jail administrator, drawing blood, and started a fire in the jail on two occasions, causing smoke damage. Guards were forced to physically remove defendant from his cell to attend his arraignment and had to cover him with a sheet because he refused to put on his clothes. The jail administrator believed that defendant's mental conditions caused defendant to be combative.

¶ 16    In arguing for a lenient sentence, defendant's attorney asserted that there were statutory and nonstatutory mitigation factors in defendant's favor with respect to defendant's culpability for Catlin's murder. Defense counsel argued that evidence in mitigation included the evidence of heavy drinking by defendant's mother during her pregnancy with defendant, which left defendant mentally impaired and brain damaged. Defense counsel emphasized that, through no fault of defendant's, defendant was unable to empathize with others and lacked impulse control. Counsel argued that defendant had a "lifetime history of minimum functioning [and] borderline range of intelligence," which resulted in a diminished "understanding of social situations" and an inability "to maintain relationship responses." Defendant's attorney argued that defendant's intellectual disability coupled with his fetal alcohol syndrome created "a recipe for disaster." The attorney "strongly urge[d]" the sentencing court, in fashioning a just sentence, to consider the "young man's background [and] the tragedy of his first 20 some years on this planet."

¶ 17    At the time of defendant's sentencing, section 5-5-3.1 of the Unified Code of Corrections (Code of Corrections) required sentencing courts to consider enumerated mitigating circumstances, which "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment." 730 ILCS 5/5-5-3.1(a) (West 1992). Those mitigating circumstances included that "the defendant was [with an intellectual disability] as defined in Section 5-1-13 of [the Code of Corrections]." *Id.* § 5-5-3.1(a)(13). Section 5-1-13 of the Code of Corrections, in

turn, defined intellectual disability as "sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjudgment." *Id.* § 5-1-13.

¶ 18    The record of the sentencing hearing establishes that the circuit court considered defendant's intellectual disabilities as a mitigating circumstance. Prior to announcing its sentence, the circuit court stated, "I have considered the factors in mitigation as found in [section 5-5-3.1] and I determine that the one that is applicable is that the defendant is [intellectually disabled]." The circuit court also noted several factors in aggravation, including that defendant's conduct caused serious physical harm, that defendant has a history of prior delinquent and criminal activity, and that Catlin was a person 60 years of age or older.

¶ 19    After considering mitigating and aggravating factors, the presentencing investigation report, the written reports and testimony of the mental health experts, and the victim impact statements, the circuit court sentenced defendant to 90 years of imprisonment for murdering Catlin and a consecutive sentence of 15 years for robbery, resulting in an aggregate sentence of 105 years of imprisonment. The circuit court found that defendant qualified for an extended term sentence based on Catlin's age when defendant killed her. The circuit court further determined that a 90-year sentence for murder was "necessary for the protection of the public and that any lesser sentence would depreciate the seriousness of this defendant's conduct and would be inconsistent with the ends of justice." The circuit court also stated that the Department of Corrections would have information concerning the nature and extent of defendant's mental illness and would be able to "fashion a situation of incarceration" that would ensure both defendant's safety and that of other inmates. The circuit court noted that the Department of Corrections was statutorily required to periodically examine the nature, extent, continuance, and treatment of defendant's mental illness.

¶ 20    Defendant filed a motion to reconsider the sentences, arguing that the sentences were excessive because of his intellectual disabilities. Defendant acknowledged Dr. Chapman's testimony that his mental disorders had no cure but emphasized that his behavior was affected by his abusive family environment and that Dr. Chapman believed he "could exist in a supportive environment." In denying the motion to

reconsider the sentences, the circuit court again explained that it "consider[ed] the testimony of the mental health experts" and found that defendant's lengthy sentence was appropriate for both defendant and society due to the serious offense and defendant's need for a supportive environment.

¶ 21 On direct appeal, defendant argued that the circuit court abused its discretion in sentencing him to a term of 90 years' imprisonment for first degree murder, asserting that the circuit court did not adequately consider and give sufficient weight to his mental conditions and rehabilitation potential. Specifically, defendant defined the issue on appeal as "[w]hether the trial court abused its discretion in sentencing [defendant] to ninety years' imprisonment for murder where the defendant suffers from fetal alcohol syndrome, has a very low IQ, and where in the future there may be some treatment for his condition." Defendant cited the requirement set out in the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) that all penalties should be determined both according to the seriousness of the offense and with the object of restoring the offender to useful citizenship. In addition, defendant cited the proportionate penalties clause's requirement that the sentencing court consider rehabilitation as an objective of the sentence. He argued that "the trial court considered the defendant's severe emotional problems which exhibited themselves at the time of the offense but failed to give them adequate weight." Defendant maintained that his relative youth, severe emotional problems, abusive background, and mental disorders warranted a lesser sentence. He therefore asked the appellate court to reduce his murder sentence to 60 years in prison.

¶ 22 The State disagreed and argued that "the judge considered the defendant's background, prior criminal history[,] and mental illness in determining the sentence." The State pointed out that the sentencing judge believed rehabilitation was unlikely considering defendant's low mental ability and history of criminal behavior and asserted that the circuit court's findings in this regard were supported by the evidence.

¶ 23 On February 7, 1996, the appellate court affirmed defendant's sentences on direct appeal. *People v. Clark*, 277 Ill. App. 3d 1122 (table) (1996) (unpublished order under Illinois Supreme Court Rule 23). The appellate court noted that the evidence in the record established that defendant "suffered from psychological

disorders which would make rehabilitation difficult" and that defendant's prior criminal record weighed heavily against him in sentencing, "especially since the defendant had been on parole for residential burglary when he robbed and killed Catlin." The appellate court found "no error in the [circuit] court's consideration of the evidence" and that the circuit court did not abuse its discretion in sentencing defendant to 90 years' imprisonment for first degree murder.

¶ 24        In May 2001, defendant filed his first postconviction petition pursuant to the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et. seq.* (West 2000)), raising various challenges to his plea and sentence, including that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that his trial counsel was ineffective for coercing him to plead guilty, and that the factual basis for the guilty plea was inadequate. In this initial postconviction petition, defendant did not raise any challenge to his sentences under the principles embodied in the proportionate penalties clause of the Illinois Constitution. The circuit court granted the State's motion to dismiss the postconviction petition, and the appellate court affirmed the dismissal on appeal, agreeing with the circuit court that the petition failed to state the gist of a constitutional claim. *People v. Clark*, 371 Ill. App. 3d 1217 (2007) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 25        In December 2012, defendant filed, *pro se*, a second postconviction petition without first filing a motion requesting leave to file a successive postconviction petition. See 725 ILCS 5/122-1(f) (West 2018) (requiring leave for filing a successive postconviction petition). Nonetheless, the circuit court appointed postconviction counsel to represent defendant, and counsel then filed an amended postconviction petition. Defendant also filed an additional *pro se* postconviction petition, and appointed counsel then filed an additional amended postconviction petition. Collectively, these petitions repeated the issues raised in the first postconviction petition and raised an additional issue that defendant's sentences were void on the basis that he received two sentences stemming from the same conduct. Again, defendant did not raise a proportionate penalties challenge to his 90-year sentence in these petitions. The circuit court granted the State's motion to dismiss these petitions as failing to state the gist of a constitutional claim, and the appellate court affirmed. *People v. Clark*, No. 3-12-0742 (2013) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 26     On September 4, 2018, defendant filed the motion that is at issue in this appeal, *i.e.*, a *pro se* motion for leave to file a successive postconviction petition pursuant to section 122-1(f) of the Postconviction Act (725 ILCS 5/122-1(f) (West 2018)). Defendant sought leave to file a successive postconviction petition to raise a new challenge to his sentence under the proportionate penalties clause of the Illinois Constitution. Specifically, defendant argues that his 90-year sentence for first degree murder is a *de facto* life sentence that violates the proportionate penalties clause of the Illinois Constitution because, according to defendant, the circuit court did not give sufficient weight to his intellectual disabilities or his age as mitigating factors before sentencing him to 90 years in prison for first degree murder.

¶ 27     Defendant acknowledged that the Postconviction Act contemplates the filing of only one petition. He argued, however, that his petition satisfied the cause-and-prejudice test for filing a successive postconviction petition, citing *Miller v. Alabama*, 567 U.S. 460 (2012), and cases applying the *Miller* Court's holding.

¶ 28     The circuit court denied defendant's *pro se* motion for leave to file a successive postconviction petition. The circuit court noted that it was "well aware" of defendant's mental state when it imposed the 90-year sentence and stated that it "had ample opportunity to consider [defendant's] mental state at the time of sentencing and did so." The circuit court further added that there was no new law or constitutional principle that would direct a different conclusion in this case. The circuit court held, "All of the matters brought forward in this petition (diminished capacity, youth, fetal alcohol syndrome, etc.) were fully explored by experts and presented to the [circuit court] at the time it made its determination." The circuit court concluded that defendant was "asking for a re-weighing of the factors in mitigation within the existing constitutional sentencing framework" and that, not only could this have been done on direct appeal and in a first postconviction petition, that "*was* done." (Emphasis in original.) The circuit court, therefore, concluded that defendant failed to satisfy the cause-and-prejudice test and denied him leave to file a successive petition.

¶ 29     On appeal, a majority of the appellate court affirmed the circuit court's judgment. 2021 IL App (3d) 180610, ¶ 17. The majority emphasized that the Postconviction Act generally contemplates the filing of only one postconviction petition and concluded that defendant could not satisfy the cause-and-prejudice test

for filing a successive postconviction petition. *Id.* ¶ 10. The appellate court majority noted that, after defendant filed his opening brief in the appeal, this court decided *People v. Coty*, 2020 IL 123972, ¶¶ 39-45, where we held that a mandatory life sentence for an intellectually disabled adult did not violate the proportionate penalties clause where the defendant's intellectual disabilities established the defendant's future dangerousness and the intellectual disabilities would not improve over time. 2021 IL App (3d) 180610, ¶ 13.

¶ 30    Here, the appellate court majority concluded that *Coty* was controlling and, therefore, held that defendant in this case could not satisfy the cause-and-prejudice test for filing a successive postconviction petition. *Id.* ¶ 15. The majority wrote, "Defendant cannot demonstrate the prejudice necessary to warrant leave to file a successive postconviction petition, as an intellectually disabled adult defendant's natural life sentence violates neither the United States nor the Illinois Constitutions under *Coty*." *Id.* ¶ 13 (citing *Coty*, 2020 IL 123972, ¶¶ 39-45).

¶ 31    The appellate court majority also held that, because defendant was 24 years old when he committed first degree murder, he falls outside the consideration of *Miller* "and other related case law finding that a natural life sentence without parole is unconstitutional when applied to defendants who were in their teens when they committed their offenses." *Id.* ¶ 14. The appellate court majority concluded, "In light of *Coty*, defendant has failed to show the prejudice necessary to satisfy the cause and prejudice test, and the case law upon which his motion relies is not applicable to his circumstances." *Id.* ¶ 15.

¶ 32    Presiding Justice McDade dissented. The dissent concluded that defendant satisfied the "cause" portion of the cause and prejudice test because "the law has changed both substantially and substantively since his sentencing and prior postconviction filings." *Id.* ¶ 22 (McDade, P.J., dissenting). The dissent concluded that cause for filing the successive petition existed because *Miller* and the cases applying *Miller* were decided after defendant filed his initial postconviction petition. *Id.*

¶ 33    The dissent also concluded that defendant demonstrated prejudice "by stating a claim, based on new case law, that his sentence is unconstitutional and violated due process." *Id.* ¶ 24; see also *People v. Davis*, 2014 IL 115595, ¶ 42 ("*Miller*'s new substantive rule constitutes *** prejudice because it retroactively applies to

defendant's sentencing hearing"). The dissent further maintained that, in *Coty*, this court addressed "only the constitutionality of the *Coty* defendant's sentence, not the constitutionality of the sentence of every intellectually disabled adult defendant who has received a life sentence, or the equivalent thereof." 2021 IL App (3d) 180610, ¶ 25. The dissent stated that defendant in the present case differs significantly from the defendant in *Coty* because defendant in this case was roughly half the age of the defendant in *Coty* and was not a sex offender subject to a sentencing mandate as was the defendant in *Coty*. *Id.* The dissent, therefore, "would find that *Coty* does not control the outcome of defendant's appeal and his claim does not fail as a matter of law." *Id.*

¶ 34    We allowed defendant's petition for leave to appeal, pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2020), to evaluate whether he has established sufficient cause and prejudice for filing his proposed successive postconviction petition.

¶ 35                                II. ANALYSIS

¶ 36    Defendant seeks leave to file a successive postconviction petition pursuant to the Postconviction Act for the purpose of raising a new challenge to his 90-year sentence under the principles embodied in the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Our analysis begins by setting out the statutory framework established by our legislature in the Postconviction Act.

¶ 37                          A. The Postconviction Act

¶ 38    The Postconviction Act (725 ILCS 5/122-1 *et seq.* (West 2018)) is the statutory procedure by which a defendant can pursue a claim that his conviction or sentence was based on a substantial denial of his constitutional rights. *People v. Boykins*, 2017 IL 121365, ¶ 9. This legislatively defined proceeding is not an appeal from the underlying judgment but is a collateral attack on the judgment. *People v. House*, 2021 IL 125124, ¶ 15. Its purpose "is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

- 12 -

¶ 39　　As noted above, defendant has already filed two petitions under the Postconviction Act. In drafting the Postconviction Act, the legislature generally intended to limit a petitioner to the filing of only one petition under the Postconviction Act. *People v. Simms*, 2018 IL 122378, ¶ 38. This court has held that the filing of successive postconviction petitions is " 'highly disfavored' " (*id.* (quoting *People v. Bailey*, 2017 IL 121450, ¶ 39)) because it " 'plagues' " finality (*id.* ¶ 39 (quoting *People v. Flores*, 153 Ill. 2d 264, 274 (1992))). "Without finality, the criminal law is deprived of much of its deterrent effect." *Teague v. Lane*, 489 U.S. 288, 309 (1989). Nonetheless, in certain circumstances, a defendant can file a successive postconviction petition but must first obtain leave of court. 725 ILCS 5/122-1(f) (West 2018). Defendant is now seeking leave to file a third postconviction petition.

¶ 40　　In the two prior proceedings under the Postconviction Act, defendant did not pursue any challenge to his 90-year sentence under proportionate penalties clause standards. Section 122-3 of the Postconviction Act specifically states that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." *Id.* § 122-3. Accordingly, defendant's proposed constitutional challenge set out in his proposed successive postconviction petition is subject to statutory waiver.

¶ 41　　In addition to waiver, defendant in this case must also overcome the application of the *res judicata* doctrine. Defendant challenged his 90-year sentence on direct appeal by invoking the same proportionate penalties clause principles that he now wants to raise anew in his proposed successive postconviction petition. The appellate court rejected defendant's contentions on direct appeal and affirmed the 90-year sentence. In postconviction proceedings, a defendant's direct appeal is *res judicata* with respect to all issues decided, and the appellate court's judgment generally bars further consideration of those issues in a postconviction proceeding. *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996); *People v. Williams*, 209 Ill. 2d 227, 232-33 (2004). "[A] defendant cannot obtain relief under the Post-Conviction Hearing Act by rephrasing previously addressed issues in constitutional terms." *People v. Franklin*, 167 Ill. 2d 1, 23 (1995).

¶ 42　　Therefore, in the present case, defendant is asking this court for leave to file a highly disfavored successive postconviction petition to revisit a constitutional issue

that was decided on direct appeal and, therefore, is barred by the *res judicata* doctrine. Defendant is also raising an issue that is statutorily waived under section 122-3 because he failed to raise the constitutional issue in his initial postconviction proceeding. Defendant seeks to avoid the procedural consequences of *res judicata* and waiver by application of the cause-and-prejudice test.

¶ 43                                    B. The Cause-and-Prejudice Test

¶ 44        The cause-and-prejudice test is "the analytical tool that is to be used to determine whether fundamental fairness requires" an exception to section 122-3's statutory waiver. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002) (cause-and-prejudice test is an exception to section 122-3).[2]

¶ 45        In addition, with respect to the *res judicata* effect of the appellate court's prior judgment on direct appeal, principles of fundamental fairness allow courts to relax the effect of the *res judicata* doctrine. *People v. King*, 192 Ill. 2d 189, 193 (2000); *People v. Emerson*, 153 Ill. 2d 100, 108 (1992) ("In a proper case, where fundamental fairness so requires, strict application of the doctrine of *res judicata* may be relaxed."). In proceedings under the Postconviction Act, fundamental fairness for relaxing the doctrine is established by satisfying the requirements of the cause-and-prejudice test. *People v. Simpson*, 204 Ill. 2d 536, 560 (2001) (principles of fundamental fairness will not be applied to relax the *res judicata* doctrine where the defendant fails to meet the requirements of the cause-and-prejudice test).

¶ 46        The legislature set out the cause-and-prejudice test in section 122-1(f) of the Postconviction Act as follows:

"Leave of court [for filing a successive postconviction petition] may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that

_____

[2]A defendant can also file a successive postconviction petition claiming actual innocence. A defendant claiming actual innocence in a successive postconviction petition does not have to meet the requirements of the cause-and-prejudice test but, instead, must meet the standard set out in *People v. Washington*, 171 Ill. 2d 475 (1996). See *People v. Jackson*, 2021 IL 124818, ¶ 27. Here, defendant does not make a claim of actual innocence.

failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2018).

¶ 47　　Both elements of the test must be met for a defendant to overcome section 122-3's waiver provision or to establish fundamental fairness for relaxing the *res judicata* doctrine. See *Davis*, 2014 IL 115595, ¶ 14. The legislature intended for the courts to make cause-and-prejudice determinations on the pleadings and not by evidentiary hearings. *People v. Smith*, 2014 IL 115946, ¶ 33. The circuit courts do this by conducting "a preliminary screening" to determine whether the motion adequately alleges facts that make a *prima facie* showing of cause and prejudice. *Bailey*, 2017 IL 121450, ¶ 24. We review a circuit court's assessment of cause and prejudice under the *de novo* standard of review. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 48　　Therefore, in the present case, our task is to consider defendant's motion requesting leave to file a successive postconviction petition, along with any supporting documentation, and determine whether defendant made a *prima facia* showing of cause and prejudice for raising a new proportionate penalties challenge to his 90-year sentence considering his intellectual disabilities and his age as a young adult.

¶ 49　　　　　　　　C. Defendant's Intellectual Disabilities

¶ 50　　We first analyze the cause-and-prejudice test with respect to defendant's claim that his 90-year sentence violates the proportionate penalties clause due to his intellectual disabilities. To analyze the cause-and-prejudice test, we must first set out the legal basis of his claim.

¶ 51　　The proportionate penalties clause of the Illinois Constitution requires that all penalties "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A defendant's sentence violates the proportionate penalties clause where,

among other circumstances, the penalty imposed is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). This court has declined to set out a specific definition of a cruel or degrading sentence because, "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339.

¶ 52    Here, defendant argues that his sentence violates the proportionate penalties clause because his intellectual disabilities have similar characteristics of those of juvenile defendants and the circuit court failed to give those characteristics proper consideration. Defendant also argues that his 90-year sentence fails to satisfy the required objective of restoring him to useful citizenship. Defendant's renewed constitutional challenge is based on cases that set out new constitutional parameters with respect to the sentencing of juvenile offenders to life in prison. Defendant seeks to expand the reasoning of these cases to life sentences of intellectually disabled young adults such as himself.

¶ 53    Specifically, after defendant's sentencing hearing and direct appeal and after the filing of his initial postconviction petition, the United States Supreme Court has held that, due to differences between juveniles and adults, the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) prohibits imposing death sentences for juvenile offenders and prohibits imposing prison sentences of life without parole for juvenile offenders found guilty of nonhomicide offenses. *Roper v. Simmons*, 543 U.S. 551, 575 (2005); *Graham v. Florida*, 560 U.S. 48, 79 (2010).

¶ 54    More recently, in *Miller*, 567 U.S. at 489, the Court expanded on this concept and held that the eighth amendment also prohibits mandatory sentencing of a juvenile to life in prison without parole, even for murder convictions. The Court reasoned that a mandatory life sentence for juveniles poses too great a risk of imposing disproportionate punishment when a sentencing court is required to impose the harshest prison sentence while being precluded from considering a lesser sentence due to the juvenile offender's age and "the wealth of characteristics and circumstances attendant to it." *Id.* at 476. *Miller* did not prohibit life sentences for juveniles but, instead, held that the eighth amendment required sentencing courts to have discretion in sentencing juveniles after considering the juvenile's

youth and the attendant characteristics of youth. *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1316 (2021) (interpreting *Miller*).

¶ 55     The primary basis for the *Miller* Court's reasoning is that a juvenile's character is not as " 'well-formed' " as an adult's character, a juvenile's traits are " 'less fixed' " than an adult's traits, and a juvenile's "actions [are] less likely to be 'evidence of irretrievable deprav[ity].' " *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 570); *Montgomery v. Louisiana*, 577 U.S. 190, 208-09 (2016) (explaining that the concern in *Miller* is that crimes committed by juvenile offenders can reflect the "*transient* immaturity of youth" (emphasis added)). Therefore, under *Miller*, the eighth amendment prohibits sentencing courts from sentencing juveniles to the harshest prison sentence available (life without parole) without the sentencing court first considering whether the juvenile's crimes reflected transient immaturity as opposed to "permanent incorrigibility." *Miller*, 567 U.S. at 471-80; *Montgomery*, 577 U.S. at 209.

¶ 56     This court has expanded the holding in *Miller* to include not only sentences of life without parole but also sentences that are the functional equivalent to life sentences, *i.e.*, *de facto* life sentences, which this court has defined as prison sentences of more than 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40. Accordingly, before a circuit court sentences a juvenile to a term of imprisonment in excess of 40 years, the eighth amendment to the United States Constitution requires the circuit court to afford the juvenile the protections set out in *Miller*, including consideration of the offender's youth and its attendant characteristics in determining the appropriate sentence. *Id.* ¶ 42.

¶ 57     In addition to *Miller*, after defendant's sentencing hearing and direct appeal and after the filing of his initial postconviction petition, the United States Supreme Court also decided *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Court held that the execution of intellectually impaired defendants violated the eighth amendment's prohibition against cruel and unusual punishment. *Id.* at 321. The Court reasoned that offenders that are intellectually impaired have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. *Id.* at 318. The Court stated that these deficiencies did not "warrant an exception from criminal sanction" but they

did diminish the "personal culpability" of such defendants. *Id.* The *Atkins* Court concluded that, due to these characteristics, imposition of the death penalty for intellectually disabled defendants would not measurably advance the deterrent nor retributive purpose of the death penalty and, therefore, such punishment was unconstitutionally excessive under the eighth amendment with respect to intellectually impaired offenders. *Id.* at 321.

¶ 58    Here, defendant does not raise an eighth amendment challenge to his 90-year sentence but, instead, seeks leave to renew his challenge under the proportionate penalties clause by expanding on the holdings in *Miller* and *Atkins*. Defendant maintains that these eighth amendment cases justify a new proportionate penalties clause challenge to his 90-year sentence because this court has interpreted the proportionate penalties clause as providing a limitation on penalties beyond those afforded by the eighth amendment. *People v. Clemons*, 2012 IL 107821, ¶ 39. Specifically, the proportionate penalties clause requires penalties to be determined with the objective of restoring the offender to useful citizenship. *Id.* This requirement provides "a limitation on penalties beyond those afforded by the eighth amendment." *Id.* However, we conclude that *Atkins*, *Miller*, and the cases applying their principles do not provide defendant with either cause or prejudice that would allow him to bring a new proportionate penalties clause challenge to the 90-year sentence.

¶ 59                                      1. Cause

¶ 60    The "cause" element of the cause-and-prejudice test requires defendant to show that some objective factor external to the defense impeded his counsel's effort to raise his proportionate penalties claim in an earlier proceeding. 725 ILCS 5/122-1(f)(1) (West 2018); *Pitsonbarger*, 205 Ill. 2d at 460. Here, as explained, we are considering "cause" not only as it relates to section 122-3's waiver provision but also in terms of relaxing the *res judicata* effect of the appellate court's judgment on direct appeal, which resolved defendant's prior challenge to his sentence.

¶ 61    In *People v. Dorsey*, 2021 IL 123010, ¶ 74, this court held "that *Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a [juvenile offender] to raise a claim under the proportionate penalties clause." Our reasoning was based on our conclusion that, long before

*Miller*, Illinois law recognized the special status of juvenile offenders for purposes of applying the principles under the proportionate penalties clause. *Id.* ¶ 73 (citing *Davis*, 2014 IL 115595, ¶¶ 4-5).

¶ 62    Our analysis of "cause" in *Dorsey* applies equally to defendant's request for leave to renew his proportionate penalties clause challenge with respect to his intellectual disabilities. Long before *Miller*, Illinois law recognized the reduced culpability of defendants with intellectual disabilities.

¶ 63    At the time of defendant's sentencing, section 5-5-3.1 of the Code of Corrections required the circuit court to consider defendant's intellectual disability as a factor to be weighed in favor of withholding or minimizing a sentence of imprisonment. 730 ILCS 5/5-5-3.1(a) (West 1992). The weight of this mitigating factor was the primary focus of the defense at defendant's sentencing hearing. All of the factual information relevant to defendant's mental impairments that defendant now asserts in support of his new constitutional challenge, as well as the principles embodied in the proportionate penalties clause, were available to defendant and the circuit court, were considered by the circuit court at the time of sentencing, and were considered by the appellate court on direct appeal in affirming defendant's sentence. Defendant has not identified a newly recognized constitutional right or other objective factor that impeded him from raising his proportionate penalties claim in a prior proceeding. Instead, in substance, defendant merely seeks a second chance at requesting the court to give additional weight to his intellectual disabilities in mitigation.

¶ 64    In his brief in this appeal, defendant argues that the circuit court "did not give sufficient weight" to his mental conditions and rehabilitation potential. Likewise, when defendant directly appealed his sentence, he defined the specific issue before the appellate court as "[w]hether the trial court abused its discretion in sentencing [defendant] to ninety years' imprisonment for murder where the defendant suffers from fetal alcohol syndrome, has a very low IQ, and where in the future there may be some treatment for his condition." In support of his argument on direct appeal, defendant specifically cited the requirement set out in the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) that all penalties should be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. In addition, defendant cited

the proportionate penalties clause's requirement that the sentencing court consider rehabilitation as an objective of the sentence. He argued that "the trial court considered the defendant's severe emotional problems which exhibited themselves at the time of the offense but failed to give them *adequate weight*." (Emphasis added.) Defendant maintained that his relative youth, severe emotional problems, abusive background, and mental disorders warranted a lesser sentence. He therefore asked the appellate court to reduce his murder sentence to 60 years in prison. The appellate court rejected defendant's argument and declined defendant's request to reduce his sentence. Its decision was based on its evaluation of the evidence presented at the sentencing hearing and the conclusion that the evidence supported the circuit court's exercise of its discretion.

¶ 65     In denying defendant leave to file a successive postconviction petition to revisit this issue, the circuit court expressly noted that it "had ample opportunity to consider [defendant's] mental state at the time of sentencing and did so." The circuit court wrote in its order that "[a]ll of the matters brought forward in this petition (diminished capacity, youth, fetal alcohol syndrome, etc.) were fully explored by experts and presented to the [circuit court] at the time it made its determination." The circuit court observed that, in substance, what defendant is asking is a reweighing of the factors in mitigation "within the existing constitutional sentencing framework" and that, not only could this have been done on direct appeal and in a first postconviction petition, but it "*was* done." (Emphasis in original.)

¶ 66     We have relaxed strict application of the *res judicata* doctrine where the right relied on has been recognized for the first time after the direct appeal. *People v. Ikerd*, 47 Ill. 2d 211, 212 (1970). Here, for the reasons explained above, defendant's constitutional claim is not a newly recognized claim. See also *People v. Henderson*, 83 Ill. App. 3d 854, 869-70 (1980) (reviewing court considered the requirements of the proportionate penalties clause in evaluating a defendant's argument that "restoration becomes more important" when a youthful offender is involved and "the mitigating factor of defendant's [intellectual disability] was present"). Here, although the appellate court, on direct appeal, did not cite the proportionate penalties clause in its analysis, as stated, defendant invoked the principles embodied in the proportionate penalties clause while emphasizing the mitigating effect of his

intellectual disabilities. Defendant now simply seeks to rephrase the very same, previously addressed issue in light of *Miller* and *Atkins*.

¶ 67    As we concluded in *Dorsey*, the unavailability of *Miller* and *Atkins* did not impede defendant's presentation of his proportionate penalties claim on direct appeal or impede his opportunity to raise the claim in his first postconviction proceeding. See *Dorsey*, 2021 IL 123010, ¶ 74 ("*Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause' " (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59)). For these reasons, defendant's reliance on *Miller* and *Atkins* fails to establish "cause" for relaxing the *res judicata* doctrine with respect to this issue, which was decided on direct appeal, and with respect to avoiding statutory waiver set out in section 122-3 of the Postconviction Act (725 ILCS 5/122-3 (West 2018)).

¶ 68                                2. Prejudice

¶ 69    Even if defendant could establish cause, his motion for leave to file a successive postconviction petition still fails because he cannot establish the prejudice prong of the cause-and-prejudice test by advancing a *Miller*-based challenge to his 90-year sentence as it relates to his intellectual disabilities.

¶ 70    To establish "prejudice," the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Pitsonbarger*, 205 Ill. 2d at 460. We have held that the circuit court should deny leave to file a successive postconviction petition "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35 (citing *Pitsonbarger*, 205 Ill. 2d at 463). Here, defendant's claimed constitutional error fails as a matter of law.

¶ 71    The present case is unlike *Miller*, where the constitutional error occurred because the sentencing court was prohibited from considering the mitigating facts at issue in that case, *i.e.*, mitigation stemming from the juvenile defendant's youth. The *Miller* Court was concerned with mandatory life sentences where the

sentencing court had no discretion to consider the juvenile offender's youth before imposing the harshest prison sentence available. *Miller*, 567 U.S. at 479. In *Jones*, 593 U.S. at ___, 141 S. Ct. at 1314, the Court clarified that the holding in *Miller* does not apply to discretionary life sentences where the sentencing court does have discretion to consider youth and attendant characteristics at sentencing.

¶ 72   Here, defendant's *de facto* life sentence was a discretionary sentence, not a mandatory sentence. At the time of sentencing, a prison sentence for first degree murder ranged from no less than 20 years to no more than 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 1992). However, because Catlin was 60 years of age or older when defendant murdered her, section 5-8-2(a)(1) of the Unified Code of Corrections gave the circuit court discretion to impose an extended term sentence of not less than 60 years and not more than 100 years. *Id.* § 5-8-2(a)(1). This was not a mandatory sentencing enhancement. The circuit court, therefore, had discretion to sentence defendant to a sentence of 40 years or less for the first degree murder conviction. A sentence of 40 years or less would not qualify as a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 27, 40. By sentencing defendant to 90 years for first degree murder, the circuit court issued a discretionary *de facto* life sentence, making the reasoning of the *Miller* decision not applicable to defendant's sentence. See *Davis*, 2014 IL 115595, ¶ 43 (under *Miller*, "[a] minor may still be sentenced to natural life imprisonment without parole so long as the sentence is at the trial court's discretion rather than mandatory"). The reasoning in *Miller* does not apply to discretionary life sentences under proportionate penalties clause standards where the circuit court does consider all relevant mitigating factors at sentencing and the circuit court's exercise of discretion is supported by the evidence in the record.

¶ 73   In the present case, when the circuit court exercised its discretion at sentencing, the Code of Corrections required the circuit court to consider and weigh the mitigating effect of defendant's intellectual disabilities in determining the proper sentence, and the court did so. 730 ILCS 5/5-5-3.1(a) (West 1992). Therefore, the concern the *Miller* Court addressed, *i.e.*, lack of discretion to consider the characteristics of youth in mitigation, is not present in this case where the circuit court issued a discretionary sentence *after* considering the characteristics of defendant's intellectual disabilities. The circuit court's exercise of discretion at

sentencing, after considering the characteristics of defendant's intellectual disabilities, did not violate the proportionate penalties clause.

¶ 74     In *Coty*, we identified three important considerations in a proportionate penalties clause analysis with respect to a prison sentence of an intellectually disabled defendant: culpability, future dangerousness, and rehabilitative potential. *Coty*, 2020 IL 123972, ¶ 32.

¶ 75     With respect to culpability, we noted, as defendant does here, that the *Atkins* Court stated that

> "an intellectually disabled person's culpability is lessened by reason of a diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure." *Id.* ¶ 33 (citing *Atkins*, 536 U.S. at 318).

As we stated in *Coty*, however, "[p]resumably, our own legislature considered those intellectual deficits in adding 'intellectually disabled' to the list of mitigating factors to be considered at sentencing." *Id.*

¶ 76     Here, defendant's sentencing hearing included consideration of defendant's mental disabilities as a mitigating factor, albeit in the context of a discretionary prison sentence, rather than capital punishment. Accordingly, the reasons for an intellectually disabled person's lessened culpability, as identified in *Atkins*, were not disregarded or overlooked at defendant's sentencing. That was the very focus of defendant's counsel at the sentencing hearing in seeking to minimize defendant's prison sentence.

¶ 77     With respect to future dangerousness, we noted in *Coty* that evidence of a defendant's intellectual disabilities can present a " 'two-edged sword' " at sentencing. *Id.* ¶ 34 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989)). Evidence of a defendant's intellectual disabilities may diminish the defendant's blameworthiness for his crime, but at the same time, this evidence may also establish the probability of future dangerousness. *Id.* That is exactly what the evidence showed in the present case.

¶ 78     Here, there is ample evidence in the record with respect to defendant's diminished impulse control due to his intellectual disabilities, including intense anger, explosive violence, emotional instability, and other behavioral issues stemming from his mental impairments. Dr. Chapman testified that "probably the treatment that would be the most effective" was treatment where defendant is "restrained or restricted from harming himself or others, however, others more importantly." The circuit court considered and weighed this evidence in determining the appropriate sentence.

¶ 79     When the evidence at a sentencing hearing establishes that a defendant has

> " 'diminished impulse control as a result of his mental deficiency, and if that lowered impulse control render[s] him a threat to the community, a trial court might conclude that, because of the defendant's future dangerousness resulting from his lack of control, the defendant should be given a greater prison sentence in the interest of protecting the public.' " *Id.* (quoting *People v. Heider*, 231 Ill. 2d 1, 20-21 (2008)).

> As this court observed in *Coty*, the very factors that the Court articulated in *Atkins* as supporting reduced culpability in the context of death sentences are also factors that make defendant in this case a continuing danger to reoffend in the context of prison sentencing. *Id.* ¶ 36. Future dangerousness of an intellectually disabled adult is a factor properly considered as an aggravating factor at sentencing, given an appropriate evidentiary basis. *Id.* ¶ 35; see also *Heider*, 231 Ill. 2d at 20 (2008) ("a trial court might conclude, from the evidence, that a defendant's mental retardation rendered him dangerous to the community, and for this reason decided to increase the defendant's prison sentence"); *People v. Coleman*, 168 Ill. 2d 509, 537-38 (1995); *People v. McNeal*, 175 Ill. 2d 335, 370-71 (1997). The proportionate penalties clause does not prohibit a sentencing court from giving greater weight to future dangerousness of an intellectually disabled offender than the weight it gives to the offender's reduced culpability, when the sentencing court's findings are supported by the evidence in the record, as is the case here.

¶ 80     With respect to the prospect of rehabilitation as set out in the second prong of the proportionate penalties clause, we have observed that the "factors identified in *Atkins* logically impair rehabilitative potential, and, unlike a juvenile, whose mental development and maturation will eventually increase that potential, the same

cannot generally be said of the intellectually disabled over time." *Coty*, 2020 IL 123972, ¶ 37. The United States Supreme Court has recognized this principle, stating that intellectual disability " 'is a permanent, relatively static condition' " and that " 'a determination of dangerousness may be made with some accuracy based on previous behavior.' " *Id.* ¶ 38 (quoting *Heller v. Doe*, 509 U.S. 312, 323 (1993)).

¶ 81   Defendant is correct that the *Miller* Court's reasoning is based, in part, on the lesser degree of culpability due to youth, similar to the reasoning for a lesser degree of culpability for intellectually disabled defendants as set out in *Atkins*. *Id.* ¶ 39 (discussing *Miller* and *Atkins*). However, as we have stated, the *Miller* Court's primary focus "is founded, principally, on the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled." (Emphasis in original.) *Id.* With youth offenders, "as the years go by and neurological development occurs, deficiencies will be reformed" (*id.* ¶ 40), which diminishes " 'the penological justifications for imposing the harshest sentences on juvenile offenders' " (*id.* ¶ 39 (quoting *Miller*, 567 U.S. at 472)).

¶ 82   The *Miller* Court's concern with transient characteristics does not apply to defendant's characteristics. Here, the circuit court considered testimony from several mental health experts who agreed that defendant's mental impairments, which established his future dangerousness, were not transient but, instead, were not likely to improve in the future. Specifically, Drs. Farrar, Ward, and Chapman testified extensively about defendant's mental impairments. Dr. Farrar opined that little could be done for defendant's borderline intellectual disability, Dr. Ward noted that defendant's prognosis was poor, and Dr. Chapman explained that defendant's mental impairments were not curable or treatable and that a prison psychiatric unit was the most appropriate treatment, primarily for the protection of the public. Under these facts, the circuit court was not required to find that defendant had much, if any, rehabilitative potential. This evidence makes a constitutional challenge under the principles embodied in *Miller* unavailable to defendant. *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2006) (noting that this court has repeatedly held that evidence of a defendant's mental or psychological impairments may not be mitigating enough to overcome the evidence in aggravation).

¶ 83 We have instructed the circuit courts to deny leave to file a successive postconviction petition when the defendant's claims fail as a matter of law. *Pitsonbarger*, 205 Ill. 2d at 460. Here, the *Miller* line of cases does not raise new law or constitutional principles that raise doubt as to the constitutionality of defendant's 90-year sentence under the proportionate penalties clause. Accordingly, defendant's proposed successive postconviction petition fails to satisfy the prejudice prong of the cause-and-prejudice test, and the circuit court properly denied leave to file it, as it fails as a matter of law.

¶ 84                    D. Defendant's Status as an Emerging Adult

¶ 85 Defendant's motion for leave to file a successive postconviction petition also seeks to challenge his 90-year sentence under *Miller* principles because he was only 24 years old at the time of the offense. As part of his argument with respect to his age, he asks us to distinguish our reasoning in *Coty* on the basis that he was a 24-year-old adult when he committed his offenses, while the defendant in *Coty* was a 46-year-old adult.

¶ 86 Instead of an eighth amendment claim, as in *Miller*, defendant seeks leave to advance a claim under the proportionate penalties clause by applying the *Miller* Court's holding to the sentences of young adult offenders over the age of 21. Defendant argues that the brain is not fully developed until the age of 25.

¶ 87 Defendant is correct that this court has not foreclosed "emerging adult" defendants between 18 and 19 years old from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (19-year-old defendant sentenced to a term of natural life in prison); *Harris*, 2018 IL 121932, ¶¶ 1, 48 (defendant, aged 18 years and 3 months, sentenced to 76 years in prison).

¶ 88 None of the defendants in those cases were over the age of 21. Here, defendant was 24. In addition, those cases addressed the possibility of a defendant raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions. *Thompson*, 2015 IL 118151, ¶¶ 1, 44; *Harris*, 2018 IL 121932, ¶¶ 1, 48. Here, defendant seeks to raise a constitutional challenge to a

*discretionary de facto* life sentence in a *successive* postconviction petition and must be able to satisfy the cause-and-prejudice test to do so. We need not resolve the issue of whether defendant's age at the time of the offense, 24, would preclude him from raising a *Miller*-based challenge to his sentence under proportionate penalties clause standards in an initial postconviction petition. Here, defendant seeks leave to file a successive postconviction petition, but he cannot meet the requirements of either prong of the cause-and-prejudice test for filing his proposed successive postconviction petition.

¶ 89                                    1. Cause

¶ 90        As noted above, before a defendant can obtain leave to file a successive postconviction petition, defendant must establish "cause" by identifying an objective circumstance that hindered or obstructed him from raising the constitutional claim in his original postconviction petition. 725 ILCS 5/122-1(f)(1) (West 2018); *Pitsonbarger*, 205 Ill. 2d at 460.

¶ 91        In *Dorsey*, 2021 IL 123010, ¶ 73, in the context of evaluating cause-and-prejudice for filing a successive postconviction petition, we held that a juvenile defendant's proportionate penalties clause claim based on *Miller* was barred by the doctrine of *res judicata* where the juvenile raised a proportionate penalties claim on direct appeal, "arguing that the trial court failed to adequately consider his age and rehabilitative potential." For the reasons we explained above, the same principles of *res judicata* apply here where, on direct appeal, defendant argued that his relative youth, severe emotional problems, abusive background, and mental disorders warranted a lesser sentence.

¶ 92        We further held in *Dorsey* that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause" in a successive postconviction petition. *Id.* ¶ 74. We reached this conclusion because, long before *Miller*, many cases in this state already recognized that "courts have discretion to grant leniency to a juvenile even if he or she is prosecuted as an adult." *Leon Miller*, 202 Ill. 2d at 342; *Dorsey*, 2021 IL 123010, ¶ 74 (discussing *Miller v. Alabama*). As far back as 1894, this court recognized that "[t]here is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those

- 27 -

who are minors. The habits and characters of the latter are, presumably, to a large extent as yet unformed and unsettled." *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894). In addition, other Illinois cases have long held that the proportionate penalties clause required the circuit court to take into account the defendant's "youth" and "mentality" in fashioning an appropriate sentence. *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47 (citing *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992); *People v. Center*, 198 Ill. App. 3d 1025, 1034 (1990); *People v. Adams*, 8 Ill. App. 3d 8, 13-14 (1972)). In *Maldonado*, the court stated that "[t]he balancing of the retributive and rehabilitative purposes of punishment [as required by the proportionate penalties clause] requires careful consideration *** and the defendant's personal history, including his *age*, demeanor, habits, *mentality*, credibility, criminal history, general moral character, social environment, and education." (Emphases added.) *Maldonado*, 240 Ill. App. 3d at 485-86.

¶ 93    *Dorsey* involved a juvenile offender (*Dorsey*, 2021 IL 123010, ¶ 4), *i.e.*, one under age 18, and the same reasoning applies to defendant here, who was 24 years old when he murdered Catlin. As is the case with juvenile offenders, Illinois courts were also aware that "less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development." *Haines*, 2021 IL App (4th) 190612, ¶ 47 (citing *Maldonado*, *Center*, and *Adams*). Accordingly, *Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders. Instead, defendant "had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause" when he filed his previous postconviction petitions. *Id.* ¶ 49; see also *Henderson*, 83 Ill. App. 3d at 869-70 (proportionate penalties clause principles discussed by the appellate court in analyzing defendant's argument that "restoration becomes more important" when a youthful offender is involved and "the mitigating factor of defendant's [intellectual disability] was present").

¶ 94    Therefore, citing the *Miller* line of cases does not satisfy the "cause" prong of the cause-and-prejudice test for raising a proportionate penalties claim in a successive postconviction petition, as *Miller*'s unavailability does nothing to explain why defendant neglected to raise the proportionate penalties clause claim in his prior postconviction proceedings. *Dorsey*, 2021 IL 123010, ¶ 74. Because

- 28 -

defendant cannot satisfy the cause prong of the cause-and-prejudice test, the circuit court properly denied defendant's motion for leave to file a successive postconviction petition.

¶ 95                                    2. Prejudice

¶ 96        In addition to failure to establish "cause," defendant also cannot establish "prejudice" with respect to challenging his sentence due to his age. As explained above, the length of defendant's discretionary 90-year prison sentence stems, in large part, from the circuit court giving considerable weight to the seriousness of the offense and to defendant's future dangerousness caused by his intellectual disabilities, which, the evidence showed, are not treatable or curable. Therefore, defendant's age does not warrant a different proportionate penalties clause analysis than what this court set out in *Coty*.

¶ 97        As in *Coty*, the record in this case established that defendant's criminal behavior was the result of untreatable intellectual disabilities, not transient characteristics stemming from his age. In *Coty*, we rejected the defendant's *Miller*-based proportionate penalties clause challenge of a 46-year-old intellectually disabled adult, acknowledging that the intellectual disabilities made him less culpable but that the permanency of his disabilities also made him "less likely to be rehabilitated and thus more likely to reoffend." *Coty*, 2020 IL 123972, ¶¶ 40-42. Here, although defendant was 24 at the time he committed the offenses, rather than 46, the record supports a finding that defendant's emotional instability, inappropriate intense anger, and lack of anger and impulse control were permanent fixtures of his character due to his intellectual disabilities, not transitory characteristics due to his age. Therefore, defendant's age in this case does not warrant a different analysis than the analysis set out by this court in *Coty* where the evidence at the sentencing hearing established that defendant's mental deficiencies were not treatable and would not reform over time. See *id.* ¶ 40 ("The enhanced prospect that, as the years go by and neurological development occurs, deficiencies will be reformed—is not a prospect that applies to this intellectually disabled defendant, who was 46 years old when he committed this, his second sexual offense against a child."). Neurological development was not a prospect for the defendant in *Coty* and is not

a prospect for defendant in this case.

¶ 98                                    III. CONCLUSION

¶ 99        For the reasons we have stated, we affirm the judgment of the appellate court, which affirmed the decision of the circuit court to deny defendant's motion for leave to file a successive postconviction petition due to his failure to satisfy the cause-and-prejudice test.

¶ 100       Affirmed.

¶ 101       JUSTICES CUNNINGHAM, ROCHFORD, and O'BRIEN took no part in the consideration or decision of this case.