2024 IL App (4th) 230298

NO. 4-23-0298

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Winnebago County |
| JAVARUS T. LEACH, | ) | No. 03CF2076 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Joseph G. McGraw, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1  In August 2005, a jury found defendant, Javarus T. Leach, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2002)), and the trial court later sentenced him 35 years in prison and imposed a 25-year mandatory firearm enhancement, for an aggregate sentence of 60 years in prison. In December 2022, defendant filed a motion for leave to file a successive postconviction petition, arguing that his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 20 years old at the time of the offense and the sentence was imposed without consideration of his youth and its attendant characteristics.

¶ 2  In February 2023, the trial court denied defendant's motion for leave to file.

¶ 3  Defendant appeals, arguing that the trial court erred by denying him leave to file a successive postconviction petition because he established a *prima facie* case of both cause and

prejudice for his youth-based proportionate penalties claim.

¶ 4 We disagree and affirm.

¶ 5 I. BACKGROUND

¶ 6 A. The Charges and the Jury Trial

¶ 7 In August 2003, the State charged defendant with first degree murder (*id.*), alleging that, in July 2003, defendant shot and killed Quantel Blaylock.

¶ 8 In August 2005, the trial court conducted defendant's jury trial. The State presented the testimony of six eyewitnesses who were present at the intersection of Henrietta and West State Streets in Rockford, Illinois, on the evening of July 24, 2003, when defendant shot Blaylock. Each witness testified similarly that defendant and Blaylock were arguing in the street. Blaylock told defendant that he did not want to argue. Defendant pulled a gun and pointed it at Blaylock. Two of the eyewitnesses additionally testified that Blaylock put his hands in the air when defendant pulled out his gun and pointed it at Blaylock. All six witnesses testified that Blaylock then turned around and began running away. Defendant chased after Blaylock and shot at Blaylock's back.

¶ 9 A forensic pathologist testified that Blaylock suffered two gunshot wounds. One shot entered his left hip and did not exit. The other shot entered his back, traveled through his lung, and exited his chest. Blaylock died of pneumonia resulting from the gunshot wound.

¶ 10 A Rockford police detective testified that he attempted to obtain defendant's "side of the story" on four separate occasions between August 3 and 14, 2003. During one interview, the detective provided defendant with details of the investigation, including the eyewitness statements implicating defendant, and asked defendant whether it was possible that Blaylock had a gun and defendant had shot him in self-defense. Each time the detective asked defendant for his statement, defendant answered that he was not present and did not know Blaylock.

¶ 11　　　　At his jury trial, defendant testified that he shot Blaylock in self-defense. Specifically, defendant stated that went to the intersection of Henrietta and West State Streets to visit a friend. While defendant was standing with his friend next to a car, Blaylock and three other men began approaching defendant, yelling at him. Defendant testified that he saw Blaylock reach under his shirt, so defendant pulled his gun, waved it around, and told Blaylock to "get back." Defendant said he saw the butt of a gun in Blaylock's waistband, so he shot Blaylock three times. He did not remember what happened after the shooting except that everyone began running.

¶ 12　　　　On cross-examination, defendant agreed that when the detectives asked for his side of the story on August 3, 4, and 14, 2003, he told them he was not present at the shooting.

¶ 13　　　　The trial court instructed the jury on self-defense and second degree murder. The jury found defendant guilty of first degree murder.

¶ 14　　　　　　　　　　B. The Sentencing Hearing

¶ 15　　　　In October 2005, the trial court conducted defendant's sentencing hearing. The sentencing range for first degree murder was 20 to 60 years in prison, and defendant's conviction required the imposition of a 25-year mandatory firearm enhancement because the jury found that defendant "performed the acts which caused the death of Quantel Blaylock by use of a firearm."

¶ 16　　　　　　　　　　1. *The Presentence Investigation Reports*

¶ 17　　　　The trial court received a presentence investigation report (PSI) prepared by a probation officer. The report stated that defendant was born in August 1982, making him 20 years old at the time of the offense. Regarding defendant's criminal record, he had one prior conviction in 2001 for possession of a controlled substance, for which he received a sentence of 30 months in the Illinois Department of Corrections (DOC). (Defendant had other minor offenses in his past, including traffic tickets and a conservation offense.)

¶ 18    Regarding defendant's history of delinquency, the PSI referred the trial court to a PSI prepared in 2001 in conjunction with defendant's felony drug conviction (the 2001 PSI). According to the 2001 PSI, defendant was adjudicated delinquent in 1996 for possession with intent to deliver a controlled substance and received a sentence of probation. In 1997, defendant's juvenile probation was revoked because, while on probation, he committed the offenses of resisting a peace officer and possession of cannabis. Defendant was placed on intensive probation and sentenced to 30 days' detention. Shortly thereafter, defendant violated the rules of home detention and served additional time in detention. In 1998, defendant was found to have again violated his probation by violating curfew, failing to meet with his probation officer, running away from his placement, and failing to attend substance abuse treatment. As a result, in December 1998, defendant was committed to the DOC juvenile division.

¶ 19    The 2001 PSI also quoted from the social history report prepared for the juvenile court prior to defendant's commitment to the DOC juvenile division. The social history report stated the following about defendant as a juvenile:

"[Defendant] has clearly disregarded the privilege of his probation and continued to exhibit criminal behavior. He has no regard for the law, authority, or rules and regulations of probation.

The minor has been out of the reach of the Probation Office since May of 1998 and was unable to be located, seemingly with the aid of his parents.

When asked how he has money, the minor replied with the question, 'How does anybody else on the street get money?' This response leads this officer to believ [*sic*] that he is involved in illegal monetary gain. He attempted to cover up this comment by saying that he finds money on the ground; he sees it and picks it

- 4 -

up."

¶ 20     The 2005 PSI also referred the trial court to the 2001 PSI "for greater insight into defendant's upbringing." According to the 2001 PSI, defendant's parents, although separated for "several years," remained legally married. His parents were both employed, and he had a close relationship with both his mother and father. In particular, defendant reported that his father was "always available to him" and his mother was "supportive of him unconditionally." Both parents shared disciplinary duties, which consisted primarily of "privilege restrictions." Defendant "denied ever being abused in any manner by anyone." Defendant had four brothers but was only able to provide the surnames of two of them. He denied that any immediate family members had been convicted of criminal offenses or experienced substance abuse problems, but probation department records indicated that (1) defendant's father was on probation for a drug-related felony and was in jail and (2) one of defendant's brothers had been convicted of a firearms-related offense.

¶ 21     The 2005 PSI also referred to the 2001 PSI regarding defendant's educational background. According to the 2001 PSI, defendant claimed he had completed the ninth grade, but school records showed that he completed eighth grade and never entered ninth grade. In 2001, defendant expressed interest in obtaining a general equivalency degree (GED) but had no further educational or training goals. According to the PSI, "[s]ince the 2001 Presentence Report, [defendant] has not attended school, academic or vocational, nor has he received his GED."

¶ 22     The PSI also contained information about defendant's health history. Specifically, "[defendant] underwent emergency surgery for a brain tumor at the age of 12. He reported no ill effects other than continual tremors."

¶ 23     The PSI further detailed defendant's history of substance abuse, noting that defendant had received treatment in 1997 and 1998 while on juvenile probation. The 2001 PSI

contained more detailed information about that treatment. Specifically, defendant reported that he began using drugs at age 12 and alcohol at age 14. The only treatment he received occurred during his juvenile probation sentence. During that time, he was terminated from outpatient treatment for (1) sporadic attendance, (2) his refusal to provide urine specimens, and (3) his overall lack of motivation. He received inpatient services but was subsequently terminated from outpatient aftercare services due to his lack of attendance. Substance abuse treatment records were attached to the 2001 PSI.

¶ 24      The 2001 PSI also contained information from the 1998 juvenile social history report regarding defendant's gang affiliation. According to the report, although defendant denied gang affiliation, he had two tattoos that were associated with gang involvement.

¶ 25      Last, the 2001 PSI included a "Summary and Analysis" section, which concluded that defendant's social history revealed, among other things, the "lack of structure or behavioral guidelines within home of origin" and the "lack of education or marketable skills."

¶ 26      2. *The State's Evidence in Aggravation*

¶ 27      In aggravation, the State offered into evidence copies of defendant's jail disciplinary records going back to 2003 and the testimony of several witnesses. Local journalist Ed Wells testified that he knew Blaylock through a youth program and Blaylock had been a "good kid." The State also called Walter Valentine, a special agent with the Illinois State Police, who testified that in 2002, he utilized a confidential source to purchase two baggies of crack cocaine from defendant near a public grade school. Michael Clark, a Rockford police officer, testified that in 2003, he encountered defendant in a parked car behind a business at 6 a.m. in possession of a loaded handgun and cannabis. Clark stated that defendant attempted to flee, and Clark had to "t[ake] him to the ground." While on the ground, defendant continued to struggle with Clark, and

Clark's partner had to utilize pepper spray to subdue defendant.

¶ 28        James Randall, a Rockford police detective in the department's "Gang Unit," testified that defendant was a member of the Black Keystone Rangers gang, which originated in Chicago and was involved with drugs and crime.

¶ 29        Blaylock's brother, Quartez, testified about his relationship with the deceased. The State also presented victim impact statements from Quartez and Blaylock's mother, Doris Blaylock. Both reported suffering depression and other negative effects resulting from Blaylock's death. Doris also reported having trouble sleeping at night and having nightmares that included memories of her son lying in the hospital "fight[ing] for his life."

¶ 30        3. *Defendant's Evidence in Mitigation and Statement in Allocution*

¶ 31        Defendant did not offer any evidence in mitigation but made a statement in allocution in which he offered "condolences to the victim's family" but maintained that he acted in self-defense. Defendant stated, "If they never put me in a situation where a danger existed, this would never have happened. They should have left me alone."

¶ 32        4. *The Arguments*

¶ 33        The State requested a sentence of "not anywhere near the minimum sentence in this case," emphasizing that five witnesses testified to "watching this defendant chasing the victim down the street and shooting him in—in the back." Additionally, the State emphasized that when Quartez was attempting to get Blaylock into a vehicle after Blaylock had been shot, defendant shot at the vehicle, which was corroborated by the physical evidence. The State also argued that the evidence showed that Blaylock had been unarmed at the time of the shooting.

¶ 34        Additionally, the State argued that defendant was an "unrepentant *** drug dealer, gang member, [and] criminal," starting in 1996 with his juvenile record. The State then referred to

the 2001 PSI and quoted from the 1998 juvenile social history report. The State also talked about defendant's lack of education due to dropping out in eighth grade in preference of "gang and criminal activity." The State then detailed defendant's juvenile history contained in the 2001 PSI.

¶ 35    Defense counsel argued that defendant had acted in self-defense and denied that defendant was involved in gang activity. Counsel also argued, "This is a young man. He's age 23, Judge. I would ask for a minimum sentence of 20 years, uh, give him a chance for rehabilitation, give him a chance at life after 20 years in prison. 20 years is a—a huge sentence."

¶ 36                              5. *The Sentence*

¶ 37    The trial court first observed that it had considered, among other things, both the PSI and the 2001 PSI. Additionally, the court stated as follows:

> "[I]n mitigation I have considered the defendant's age. He is a young person. He has a lot of his life ahead of him. *** [H]e had some health problems at an early age, including surgery for a brain tumor, although there is no indication that had anything to do with the commission of the crime.
>
> In terms of aggravation, the Court has considered that the defendant has been an offender in the past. He was committed to the Juvenile Department of Corrections. He was later sentenced to the adult Department of Corrections for a drug case."

¶ 38    The trial court then commented that "the most aggravating factor" was the nature of the crime, which the court described as an unarmed victim running for his life and being shot from behind by defendant, who fired multiple shots. The court commented, "There is no question about [defendant's] intent to kill or do great bodily harm to the victim. Um, and it is probably one of the most aggravating kinds of homicide that the Court has to deal with." The court reasoned

- 8 -

that, "[b]ased on the defendant's background of criminal conduct and *** the evidence showing that he's continued that course of action, *** I would find that the defendant presents a danger to the community and that a substantial sentence is necessary in this case."

¶ 39        Accordingly, the trial court sentenced defendant to 35 years, with a mandatory firearm enhancement of 25 years, for an aggregate sentence of 60 years in prison.

¶ 40                        6. *The Motion To Reconsider*

¶ 41        At the conclusion of the sentencing hearings, defendant filed *instanter* a motion to reconsider his sentence, arguing, among other things, that his sentence was excessive. Specifically, defendant contended that "the [trial] court failed to follow [the proportionate penalties clause] of the Illinois Constitution which states [that] [a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." The trial court denied the motion to reconsider.

¶ 42                        C. The Direct Appeal

¶ 43        In October 2005, defendant appealed, arguing that the trial court erred when sentencing him because it failed to consider the cumulative effect of the normal sentence for first degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2004)) and the add-on for the use of a firearm in conjunction with the murder (see *id.* § 5-8-1(a)(1)(d)(iii)). The appellate court affirmed. *People v. Leach*, 372 Ill. App. 3d 1103 (2007) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 44                        D. The Initial Postconviction Petition

¶ 45        In March 2008, defendant, through attorney Francis Martinez, filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)), alleging various ways his trial counsel had rendered ineffective assistance at trial. In May 2008,

the trial court advanced the petition to the second stage of proceedings and granted defense counsel's request for leave to file an amended petition.

¶ 46        In August 2010, Martinez filed a third amended petition, alleging several claims of ineffective assistance, actual innocence based on newly discovered evidence, and trial errors by the trial court.

¶ 47        In December 2011, the State filed a motion to dismiss all of defendant's postconviction claims. In March 2013, the trial court conducted a hearing on the State's motion to dismiss and took the matter under advisement.

¶ 48        In August 2013, the trial court issued an oral ruling allowing three of the claims (not relevant to this appeal) to proceed to a third-stage evidentiary hearing. However, in February 2014, before that hearing was conducted, Martinez withdrew as counsel for defendant because he was appointed to the bench.

¶ 49        In May 2014, attorney David Carter entered his appearance on behalf of defendant.

¶ 50        In November 2017, following years of status hearings regarding Carter's discussions with defendant about amending his petition, Carter filed his "Supplemental Counts to Defendant's Third Amended Petition for Postconviction Relief," alleging that (1) "defendant's due process rights were violated when the verdict form the jury received *** lacked any reference to the use of or personal discharge of a firearm" and (2) actual innocence based upon newly discovered eyewitness Tyron Pearson. Carter concurrently filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 51        The State thereafter requested a series of continuances to respond to these newly filed claims. During this time, in June 2019, defendant *pro se* filed a "Motion for Leave to Supplement Petitioner's Amended Postconviction Petition," alleging that, pursuant to *Miller v.*

*Alabama*, 567 U.S. 460 (2012), his sentence violated both the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). Defendant requested a new sentencing hearing. Neither the trial court nor the parties addressed defendant's *pro se* filing.

¶ 52　　　　In March 2020, the State filed a motion to dismiss defendant's supplemental claims, and in February 2021, the trial court entered an order dismissing the sentencing enhancement claim but advancing the actual innocence claim to the third stage.

¶ 53　　　　In November 2021, the trial court conducted the third-stage evidentiary hearing, and in December 2021, the court denied defendant postconviction relief.

¶ 54　　　　Defendant appealed, and this court affirmed. *People v. Leach*, 2023 IL App (4th) 220014-U, ¶ 1.

¶ 55　　　　E. The Motion for Leave To File a Successive Postconviction Petition

¶ 56　　　　In December 2022, defendant *pro se* filed a motion for leave to file a successive postconviction petition, alleging Carter rendered unreasonable assistance by failing to adopt defendant's 2019 *pro se* motion for leave to supplement his initial petition, which alleged a *Miller*-based proportionate penalties claim. As to cause, defendant alleged that *Miller* applied retroactively to state collateral proceedings. As to prejudice, defendant alleged that a reasonable probability existed that under the "new rule," he would have received a lesser sentence.

¶ 57　　　　Defendant alleged the following facts pertaining to his own circumstances: (1) while he was growing up, his father was on drugs and fought with his mother, making it difficult for him to learn in school while acting out against other children; (2) defendant had a shortage of food in the home while growing up, and his father's drug use forced him "grow up fast" to protect his mother while they "went in and out of shelters"; (3) defendant was bullied while

young and was hit in the head with rocks and in the back with a pole; and (4) defendant witnessed his brother shoot his father when defendant was young, and his brain tumor was found days later, resulting in emergency surgery at 12 years old.

¶ 58    Defendant claimed that all of these difficult past experiences and family circumstances "contributed to hanging out with the wrong crowd and doing drugs to numb the pain while still getting into trouble, not learning my [lesson] time after time of the same thing; eventually dropping out of school after ninth grade." Defendant argued that "[due] to these above mentioned specific individual characteristics an as applied claim exists under *Miller v. Alabama* (newly discovered evidence) for young adults at the time of the offense my quick reaction w[ere] those of a juvenile." Defendant also asserted that when he was nine years old, he "burned his room up" and subsequently saw a psychiatrist. He also cited *People v. Franklin*, 2020 IL App (1st) 171628, 171 N.E.3d 971, and *People v. Daniels*, 2020 IL App (1st) 171738, 163 N.E.3d 1216, to illustrate "recent trends in treating offenders under 21 years old (differently) than ADULTS."

¶ 59    In February 2023, the trial court denied defendant leave to file a successive petition, concluding as follows:

> "[Defendant] fails to show cause or prejudice or actual innocence or that there is some recently discovered information that he could not have previously presented. He's essentially just making legal arguments that could have been made before, citing case law that could have been cited before[,] so the motion is heard and denied."

¶ 60    This appeal followed.

¶ 61                                II. ANALYSIS

¶ 62    Defendant appeals, arguing that the trial court erred by denying him leave to file a

- 12 -

successive postconviction petition because he established a *prima facie* case of both cause and prejudice for his youth-based proportionate penalties claim.

¶ 63     We disagree and affirm.

¶ 64                    A. The Act

¶ 65     "The [Act] (725 ILCS 5/122-1 *et seq.* (West 2018)) is the statutory procedure by which a defendant can pursue a claim that his conviction or sentence was based on a substantial denial of his constitutional rights." *People v. Clark*, 2023 IL 127273, ¶ 38, 216 N.E.3d 855. "The Act itself contemplates the filing of a single petition ***." *People v. Lusby*, 2020 IL 124046, ¶ 27, 182 N.E.3d 563. "[T]he filing of successive postconviction petitions is highly disfavored [citation] because it plagues finality [citation]." (Internal quotation marks omitted.) *Clark*, 2023 IL 127273, ¶ 39. " 'Without finality, the criminal law is deprived of much of its deterrent effect.' " *Id.* (quoting *Teague v. Lane*, 489 U.S. 288, 309 (1989)).

¶ 66     A defendant must obtain leave of court to file a second or subsequent petition. 725 ILCS 5/122-1(f) (West 2022). To obtain leave of court, a defendant must demonstrate both (1) "cause" for the failure to raise the claim in the initial petition and (2) "prejudice" resulting from that failure. *Lusby*, 2020 IL 124046, ¶ 27. To demonstrate "cause," a defendant must identify an objective factor that impeded his ability to raise a specific claim during the initial postconviction proceeding. 725 ILCS 5/122-1(f) (West 2022). To demonstrate "prejudice," a defendant must show that the claim not raised during the initial proceeding so infected the trial that the resulting conviction or sentence violated due process. *Id.*

¶ 67     To obtain leave to file a successive petition, the defendant must allege a *prima facie* showing of both cause and prejudice. *Clark*, 2023 IL 127273, ¶ 47. Meeting the cause-and-prejudice test is a "more exacting" standard than the " 'gist' standard" applicable to the review of

initial postconviction petitions. *People v. Conick*, 232 Ill. 2d 132, 142, 902 N.E.2d 637, 643 (2008). Leave of court to file a successive petition should be denied when it is clear from a review of the successive petition and supporting documents that the claims raised fail as a matter of law or are insufficient to justify further proceedings. *People v. Smith*, 2014 IL 115946, ¶ 35, 21 N.E.3d 1172.

¶ 68    A trial court's denial of leave to file a successive petition is reviewed *de novo*. *Clark*, 2023 IL 127273, ¶ 47.

¶ 69                    B. Defendant's Proportionate Penalties Claim

¶ 70    Defendant argues that the trial court erred by denying him leave to file in a successive petition a claim that his 60-year sentence, imposed for a crime he committed when he was 20 years old, violated the proportionate penalties clause as applied to him.

¶ 71    Defendant contends that he demonstrated "cause" in two separate ways. First, he claims that he "could not have included in his initial petition a claim that the tenets of *Miller* applied to him under the proportionate penalties clause [when] the Illinois Supreme Court did not invite such arguments until years after both his sentencing hearing and the filing of his initial post-conviction petition." Second, defendant asserts that his postconviction counsel unreasonably failed to adopt his *pro se* motion to supplement the initial petition with the proportionate penalties claim.

¶ 72    Defendant contends that he established prejudice by alleging facts about his upbringing that demonstrate that he was the functional equivalent of a juvenile at the time of his offense and was thus entitled to a *Miller*-compliant hearing.

¶ 73    We disagree that defendant established either cause or prejudice.

¶ 74        1. Miller*'s Previous Unavailability Does Not Establish "Cause"*

¶ 75    Regarding defendant's first argument about cause, the Illinois Supreme Court has made clear that "*Miller*'s announcement of a new substantive rule under the eighth amendment

- 14 -

does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *People v. Dorsey*, 2021 IL 123010, ¶ 74, 183 N.E.3d 715. The court explained, "*Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59, 127 N.E.3d 131).

¶ 76        One obvious distinction between *Dorsey* and the present case is that *Dorsey* involved a juvenile defendant, while the present case involves a young adult defendant. Nonetheless, the supreme court has recently applied the rule it announced in *Dorsey* to young adult defendants as well.

¶ 77        In *Clark*, 2023 IL 127273, ¶¶ 1-2, the supreme court affirmed the denial of the defendant's request for leave to file a successive postconviction petition in which he claimed that his 90-year sentence for first degree murder, committed when he was 24 years old, violated the proportionate penalties clause. In doing so, the supreme court reaffirmed *Dorsey* and explained the reasoning behind that holding, writing as follows:

> "We further held in *Dorsey* that '*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause' in a successive postconviction petition. [Citation.] We reached this conclusion because, long before *Miller*, many cases in this state already recognized that 'courts have discretion to grant leniency to a juvenile even if he or she is prosecuted as an adult.' [*People v. Miller*, 202 Ill. 2d 328, 342 (2002) (*Leon Miller*)]; *Dorsey*, 2021 IL 123010, ¶ 74 (discussing *Miller*). As far back as 1894, this court recognized that '[t]here is in the law of nature, as well as in the law that governs society, a marked

distinction between persons of mature age and those who are minors. The habits and characters of the latter are, presumably, to a large extent as yet unformed and unsettled.' *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894). In addition, other Illinois cases have long held that the proportionate penalties clause required the trial court to take into account the defendant's 'youth' and 'mentality' in fashioning an appropriate sentence. *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47 (citing *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992); [citations]). In *Maldonado*, the court stated that '[t]he balancing of the retributive and rehabilitative purposes of punishment [as required by the proportionate penalties clause] requires careful consideration *** and the defendant's personal history, including his *age*, demeanor, habits, *mentality*, credibility, criminal history, general moral character, social environment, and education.' [Citation.]

*Dorsey* involved a juvenile offender [citation], *i.e.*, one under age 18, and the same reasoning applies to defendant here, who was 24 years old when he murdered [the victim]. As is the case with juvenile offenders, Illinois courts were also aware that 'less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development.' *Haines*, 2021 IL App (4th) 190612, ¶ 47 (citing *Maldonado* ***). Accordingly, *Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders. Instead, defendant 'had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause' when he filed his previous postconviction petitions. [Citations.]

Therefore, citing the *Miller* line of cases does not satisfy the 'cause' prong of the cause-and-prejudice test for raising a proportionate penalties claim in a successive postconviction petition, as *Miller*'s unavailability does nothing to explain why defendant neglected to raise the proportionate penalties clause claim in his prior postconviction proceedings." (Emphases in original.) *Clark*, 2023 IL 127273, ¶¶ 92-94.

¶ 78 Similarly, in *People v. Moore*, 2023 IL 126461, ¶ 1, the supreme court addressed the consolidated cases of two young adult defendants who were denied leave to file successive petitions alleging youth-based proportionate penalties challenges to their sentences. Both Tory Moore and Marvin Williams, in separate prosecutions, were sentenced to life in prison without the possibility of parole for first degree murders they committed at the age of 19 years old. *Id.* Both defendants sought leave to file successive petitions, asserting *Miller*-based proportionate penalties claims. *Id.* ¶¶ 1, 15, 25. The supreme court cited *Dorsey* and *Clark* for the proposition that *Miller* does not provide cause for a juvenile to raise a claim under the proportionate penalties clause and then concluded, "As *Miller* does not directly apply to young adults, it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id.* ¶ 40. Because the defendants were unable to make a showing of cause, the supreme court affirmed the judgments of the trial courts denying them leave to file their successive petitions. *Id.* ¶ 42.

¶ 79 Nonetheless, despite the supreme court's clear pronouncements in *Clark* and *Moore*, defendant contends in his brief that it is not *Miller*'s unavailability that excuses his failure to bring his claim earlier, but the unavailability of *People v. Harris*, 2018 IL 121932, 120 N.E.3d 900. In *Harris*, the supreme court held that a young adult offender could use the evolving neuroscience on juvenile maturity and brain development referenced in *Miller* to support a claim

that a statutory sentencing scheme, as applied to him, was unconstitutional in view of his neurological immaturity. *Id.* ¶¶ 46-48. Defendant argues that *Harris* is the case that "invited" young adult offenders to utilize the reasoning of *Miller* to advance youth-based proportionate penalties claims.

¶ 80 However, this court considered and rejected this argument in *People v. Haines*, 2021 IL App (4th) 190612, ¶¶ 56-57, 188 N.E.3d 825. In *Haines*, the defendant was sentenced to 55 years in prison for first degree murder, consisting of 30 years plus a 25-year firearm enhancement. *Id.* ¶ 1. The defendant sought leave to file a successive petition, alleging that his sentence, imposed for a crime he committed at the age of 18, violated the proportionate penalties clause because he was still neurologically immature when he committed murder and his *de facto* life sentence failed to account for his youth and potential for rehabilitation. *Id.* ¶ 12. The trial court denied him leave to file his successive petition (*id.* ¶ 13), and this court affirmed, holding that "the nonexistence of *Harris* was no cause for defendant's failure to raise, in his initial postconviction proceeding, the proportionate-penalties claim that he seeks to raise now" (*id.* ¶ 57).

¶ 81 Similar to *Moore*, we explained that the defendant did not need *Harris* to tell him that he could have brought his youth-based proportionate penalties claim in his initial postconviction petition, writing as follows:

"Not everything the supreme court says in its decisions is newly minted law. Under already-existing case law, the proportionate-penalties clause required sentencing courts to take into account the immaturity or incomplete development of young adults. [Citations.] *Necessarily*, then, it would have been entirely acceptable for a young-adult offender to present neurological research buttressing the already-accepted 'wisdom in favor of according a defendant's youth great weight in

sentencing.' [Citation.] The claim was buildable." (Emphasis in original.) *Id.* ¶ 56.

¶ 82 This court further explained as follows:

"If, in the exercise of reasonable diligence, a claim can be built out of existing legal materials, the defendant has to build the claim without waiting for someone else in another case to do so. Defendants cannot wait until a claim falls ready-made into their lap. Some assembly may be required. Ease of argument is not the standard. '[T]he question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was "available" at all.' " *Id.* ¶ 45 (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)).

¶ 83 Simply put, even prior to *Miller* or *Harris*, defendant had the tools to construct a claim that his sentence violated the proportionate penalties clause because the sentencing judge did not take into account (1) his youth and (2) how his particular neurobiological development affected his maturity and decision-making. The present case is a perfect example of a defendant waiting until the claim "falls ready-made into [his] lap." *Id. Miller* and *Harris* made defendant's task easier, but the claim was available to him long before those decisions were issued.

¶ 84 We note that defendant spends considerable time in his brief asserting that *Haines* was wrongly decided and should be abandoned. We emphatically reject defendant's claim and resolutely reaffirm our reasoning and holding in *Haines*. As further support for our reaffirmation of *Haines*, we note that the Illinois Supreme Court in *Clark*, as part of its "cause" analysis, twice cited *Haines* with approval. See *Clark*, 2023 IL 127273, ¶¶ 92-93.

¶ 85 Defendant also contends that *Dorsey* does not "control the analysis in [the present] case" because *Dorsey* involved a discretionary sentence, while defendant's sentence was mandatory. Defendant claims that the supreme court "recently made it clear [in *Moore*] that the

*Dorsey* rationale did not extend to situations where the sentencing scheme *mandates* the imposition of at least a *de facto* life sentence." (Emphasis in original.) In support of this claim, defendant quotes from *Moore*: "As *Miller* did not change the law applicable to discretionary sentences imposed on young adult offenders, it does not provide cause for Moore and Williams to file their proposed successive postconviction petitions." *Moore*, 2023 IL 126461, ¶ 44. Defendant reads *Moore* too broadly.

¶ 86      However, nothing in *Moore* suggested a distinction between discretionary and mandatory sentences. *Moore* used the term "discretionary" because that case involved discretionary sentences, not mandatory ones. See *id.* ¶ 23 (noting that the trial court had imposed a "discretionary life sentence" upon Williams (internal quotation marks omitted)); *People v. Moore*, No. 4-99-0451 (2001) (unpublished order under Illinois Supreme Court Rule 23) (noting that "[t]]he trial court has great discretion in fashioning an appropriate sentence within statutory limits" and holding that the trial court's imposition of a natural life sentence was not excessive).

¶ 87      We further note that, in paragraph 42 of *Moore*, just prior to the quote from paragraph 44 that defendant selected to highlight in his brief, the court announced the same holding but omitted the word "discretionary," stating simply, "As *Miller* did not change the law applicable to *young adults*, it does not provide cause for the proportionate penalties challenges advanced in Moore's and Williams's proposed successive postconviction petitions." (Emphasis added.) *Moore*, 2023 IL 126461, ¶ 42. For these reasons, we disagree with defendant that the supreme court in *Moore* "made it clear" that *Dorsey* did not extend to young adults. Instead, *Moore* makes clear that defendant engages in selective reading.

¶ 88      The supreme court recently reaffirmed its holdings in both *Dorsey* and *Moore* in *People v. Hilliard*, 2023 IL 128186, ¶ 28, in which the supreme court affirmed the summary

dismissal of the 18-year-old defendant's *Miller*-based as-applied proportionate penalties claim. In *Hilliard*, the court cited *Dorsey* for the proposition that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause in a successive postconviction petition" and *Moore* for the proposition that "*Miller* applies to neither discretionary sentences *nor* adults." (Emphasis added and internal quotation marks omitted.) *Id.*

¶ 89 Due to the factual similarity of *People v. Minniefield*, 2020 IL App (1st) 170541, we note in particular *Hilliard*'s abrogation of *Minniefield*. In *Minniefield*, the appellate court reversed the decision of the trial court denying the 19-year-old defendant leave to file a successive *Miller*-based proportionate penalties challenge to his 50-year mandatory *de facto* life sentence, which consisted of 25 years for murder plus a 25-year mandatory firearm enhancement. *Id.* ¶¶ 1, 3. The *Minniefield* court held that *Miller*'s unavailability in 2007, when the defendant filed his first postconviction petition, constituted cause for his filing a second petition. *Id.* ¶ 31. However, the *Hilliard* court included *Minniefield* among other appellate court decisions that had "infirm[ly]" held, contrary to *Dorsey*, that *Miller*'s prior unavailability constituted "cause." See *Hilliard*, 2023 IL 128186, ¶ 28. *Hilliard*'s critique of *Minniefield*'s "cause" analysis lends additional support for our rejection of defendant's arguments in this case.

¶ 90 We conclude that, pursuant to *Dorsey*, *Clark*, *Moore*, and *Haines*, the prior unavailability of the *Miller* line of cases does not provide cause for defendant to bring his proportionate penalties claim.

¶ 91 2. *Postconviction Counsel's Failure To Bring the Claim in the Initial Petition Does Not Establish "Cause" or "Prejudice"*

¶ 92 Alternatively, defendant argues that his postconviction counsel rendered

unreasonable assistance when he failed to adopt defendant's *pro se* motion to supplement his initial postconviction petition with the proportionate penalties claim and, accordingly, constitutes cause to bring the claim in a successive petition. We disagree.

¶ 93                    a. Reasonable Assistance of Postconviction Counsel

¶ 94        The Act confers upon defendants a statutory right to reasonable assistance of counsel. *People v. Perkins*, 229 Ill. 2d 34, 42, 890 N.E.2d 398, 402 (2007). The supreme court has held that reasonable assistance requires postconviction counsel to perform only the specific duties set forth in Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). *People v. Greer*, 212 Ill. 2d 192, 204-05, 817 N.E.2d 511, 519 (2004). Rule 651(c) requires postconviction counsel to (1) consult with the defendant to ascertain his contentions of deprivations of constitutional rights, (2) examine the record, and (3) make any amendments to the *pro se* petition necessary for an adequate presentation of the defendant's claims. *Id.* at 205.

¶ 95        "Fulfillment of the third obligation under Rule 651(c) does not require postconviction counsel to advance frivolous or spurious claims on defendant's behalf." *Id.* "If amendments to a *pro se* postconviction petition would only further a frivolous or patently nonmeritorious claim, they are not 'necessary' within the meaning of the rule." *Id.* In fact, "the mere filing of an amended petition by counsel under such circumstances would appear to violate the proscriptions of Supreme Court Rule 137," which provides that an attorney's signature on a pleading certifies that the pleading is "well grounded in fact and is warranted by existing law." (Internal quotation marks omitted.) *Id.*

¶ 96        b. Defendant's Sentence Did Not Violate the Proportionate Penalties Clause

¶ 97        In the present case, postconviction counsel was not required to amend defendant's petition to allege the proportionate penalties claim because that claim lacks merit. Put another way,

had postconviction counsel amended the petition to allege that defendant's 60-year sentence violated the proportionate penalties clause because it amounted to a *de facto* life sentence imposed without consideration of defendant's youth and its attendant characteristics, that claim would fail because the trial court *did* consider defendant's youth and its attendant characteristics when imposing the sentence.

¶ 98 At sentencing, the trial court considered two PSI reports—one prepared in September 2005, when defendant was 23 years old, and the other prepared in February 2001, when defendant was 18 years old. The 2001 PSI contained information from a juvenile court social history report prepared in 1998, when defendant was 15 or 16 years old. (The record lacks the precise date the report was prepared, whether before or after defendant's birthday in 1998.) As we earlier recounted, the reports that the trial court considered contained detailed information about defendant's (1) age, (2) relationship with his parents during his childhood, (3) education, (4) history of juvenile delinquency, (5) health as a child, (6) substance abuse issues as a juvenile, and (7) treatment he received for those issues.

¶ 99 Without repeating the details of the reports, which we have already set forth (*supra* ¶¶ 16-25), we note that the trial court was aware that defendant had a troubled childhood, abused alcohol as a child, did not attend school past the eighth grade, and lacked "structure or behavioral guidelines within [his] home of origin." At defendant's sentencing hearing, the court was aware that defendant grew up with a father who was jailed for drugs, his brother was convicted of a firearms-related offense, and defendant had a brain tumor removed at the age of 12. We point out these three specific facts in particular because defendant alleged them in his motion for leave to file a supplemental petition as facts unique to him that justify treating him as a juvenile rather than an adult for sentencing purposes. The problem for defendant is that the court was already aware of

these facts when it sentenced him.

¶ 100     Furthermore, at his sentencing hearing, defendant declined to present any evidence in mitigation, although he had the opportunity to do so.

¶ 101     During arguments at sentencing, both the State and defendant's counsel highlighted defendant's youth. The State recited defendant's history of delinquency and quoted from the 1998 social investigation report prepared for the juvenile court. Defendant's counsel argued that defendant was a "young man" who acted in self-defense and asked for the minimum sentence.

¶ 102     When ruling, the trial court specifically stated that it "considered the defendant's age" and that defendant was "a young person" who had "a lot of life ahead of him." The court referred to defendant's brain tumor that was removed at age 12 and noted there was no evidence the tumor had anything to do with defendant's commission of the crime. The court also referred to defendant's history of juvenile delinquency.

¶ 103     All of the above establishes that defendant's youth and childhood circumstances were not only considered but also emphasized and highlighted by the trial court and the parties during defendant's sentencing hearing.

¶ 104     Nonetheless, youth—or rehabilitative potential—is not the only focus of a proportionate penalties analysis. The proportionate penalties clause requires that "[a]ll penalties shall be determined *both* according to [(1)] the seriousness of the offense and [(2)] with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11. A defendant's sentence violates the proportionate penalties clause when the penalty is "cruel, degrading, or *so wholly disproportionate to the offense committed* as to shock the moral sense of the community." (Emphasis added and internal quotation marks omitted.) *People v. Williams*, 2012 IL App (1st) 100126, ¶ 48.

¶ 105	In this case, the trial court properly considered both (1) defendant's young age and childhood circumstances and (2) the seriousness of the offense, calling it "the most aggravating factor." As the court described the offense, defendant chased and shot an unarmed man multiple times in the back as he ran for his life. According to the evidence, Blaylock told defendant he did not want to fight and even held his hands up in the air in submission before turning to run away. Physical evidence supported witness testimony that defendant continued to fire his gun while Blaylock's brother was lifting him into a car to drive him to the hospital. The shooting took place during the evening hours in a residential area where multiple eyewitnesses unrelated to the offense were located.

¶ 106	Defendant's sentence does not shock the moral sense of the community; instead, it is the callousness and coldness of defendant's crime that shocks the moral sense of the community. Furthermore, as the State points out, our supreme court has specifically rejected the argument that the 25-year firearm enhancement for first degree murder shocks the moral sense of the community or violates the proportionate penalties clause. *People v. Sharpe*, 216 Ill. 2d 481, 525, 839 N.E.2d 492, 519 (2005). In *Sharpe*, the supreme court rejected the defendant's argument that "the [firearm] enhancements to the murder statute violate the proportionate penalties clause because they do not serve the purpose of 'restoring the offender to useful citizenship.' " *Id.* (quoting Ill. Const. 1970, art. I, § 11). Moreover, the court observed that "in fixing a penalty for an offense, the possibility of rehabilitation is not given greater weight or consideration than the seriousness of the offense." *Id.*

¶ 107	Defendant argues that *Sharpe* does not relate to this case because it did not involve a juvenile or young adult offender. Nonetheless, *Sharpe* is consistent with the legislature's decision, when enacting section 5-4.5-105(b) of the Unified Code of Corrections (730 ILCS 5/5-

4.5-105(b) (West 2004)), (1) to allow sentencing courts the discretion to decline to impose mandatory firearm enhancements when sentencing juveniles but (2) *not* to extend that same discretion when sentencing young adults. In other words, the legislature determined that, for the purposes of the mandatory firearm enhancements, young adults would be treated as adults and not juveniles. As the supreme court noted in *Hilliard*, "The legislature's determination of a particular punishment for a crime in and of itself is an expression of the general moral ideas of the people." *Hilliard*, 2023 IL 128186, ¶ 38. In Illinois, "[t]he distinction between a juvenile and adult remains significant. The Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." (Internal quotation marks omitted.) *Id.* ¶ 39.

¶ 108    We also specifically note that, just prior to defendant shooting and killing Blaylock, he had served an adult prison sentence for a felony drug offense; although defendant was a young adult when he committed murder, he was not a first-time adult offender. Defendant's 2½-year adult incarceration just prior to committing intentional murder does not militate in favor of his potential for rehabilitation.

¶ 109    In this case, the trial court considered defendant's youth and possibility of rehabilitation along with the seriousness of the offense. Defendant's sentence was therefore *Miller*-compliant. Moreover, the sentence imposed of 35 years for murder plus 25 years for the use of a firearm to commit the murder is not (1) wholly disproportionate to the nature of the offense or (2) shocking to the moral sense of the community. Accordingly, defendant's sentence did not violate the proportionate penalties clause and postconviction counsel did not render unreasonable assistance by failing to bring the meritless claim in defendant's initial petition. Therefore, defendant has failed to establish either (1) cause or (2) prejudice resulting from his counsel's failure to bring the claim in the initial petition. For the same reason (defendant's proportionate

penalties claim lacks merit), he has failed to show that he was prejudiced by his alleged inability to bring the claim earlier due to *Miller* and *Harris*'s unavailability. As a result, the trial court properly denied defendant leave to file his successive petition.

¶ 110                                    III. CONCLUSION

¶ 111        For the reasons stated, the judgment of the trial court is affirmed.

¶ 112        Affirmed.

*People v. Leach*, 2024 IL App (4th) 230298

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 03-CF-2076; the Hon. Joseph G. McGraw, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Austin Wright, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Luke NcNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |