2024 IL App (1st) 231355-U

SECOND DIVISION
December 24, 2024

No. 1-23-1355

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01CR811 |
| | ) | |
| CARLOS GOMEZ, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

___

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in denying defendant's motion for leave to file his successive postconviction petition because he cannot establish the requisite cause necessary to be granted leave to file.

¶ 2   Defendant Carlos Gomez appeals the trial court's denial of his motion for leave to file his *pro se* successive postconviction petition. Specifically, he contends that as an 18-year-old, his natural life sentence is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Based on evolving authority regarding youthful offenders as well as newly available research about the brain development of young

adults, defendant asserts that he satisfied the requisite cause and prejudice for filing a successive postconviction petition and the trial court erred in denying his motion.

¶ 3    Following a jury trial, defendant was convicted of first degree murder, aggravated criminal sexual assault, and home invasion in the November 2000 death of 63-year-old J.R. The trial court subsequently sentenced defendant to a term of natural life for first degree murder, 30 years for aggravated criminal sexual assault, and 30 years for home invasion. We summarize the evidence presented at defendant's jury trial as necessary for resolution of the issue raised on appeal. A full discussion of the evidence presented at defendant's trial is set forth in defendant's direct appeal. See *People v. Gomez*, 2011 IL App (1st) 092185.

¶ 4    In November 2000, R.R. lived with his sister J.R. at 3777 West 77th Street in Chicago. J.R. was 63 years old in November 2000. On November 22, 2000, R.R. came home from work, ate dinner and left around 6:30 p.m. He returned home around 10:45 p.m. and noticed that all the lights were on in the house, which was unusual. When he went to enter the house, he found the side door unlocked. As he entered the house, he saw J.R.'s legs on the floor. As he went to her, he saw that her pants and underwear were pulled down and a knife was stuck in her neck. R.R. tried to comfort her. A few minutes later, he heard a noise, and a man ran out of the back room toward R.R. He tried to stop the man, but the man knocked R.R. down and ran out of the house. R.R. got up and saw the man run down the driveway and continue west down the block. R.R. then went back in the house and called 911.

¶ 5    R.R.'s testimony further revealed that the house was in disarray when he arrived home. The television was unplugged, drawers were open, and a jewelry box from the bedroom was in the living room. He recognized the knife in J.R.'s neck was one from a block on the kitchen

counter. On November 25, 2000, R.R. viewed a lineup at Area One and identified defendant as the man he saw run out of his house after his sister was killed.

¶ 6    Officers Christine Chiagkouris-Spanos and Sophia Terrones were the first police officers at the scene. They observed the victim on the floor with a knife in her neck and the house in disarray. R.R. spoke with the officers and described the offender as a male Hispanic, 5 feet 7 inches to 5 feet 9 inches, 18 to 20 years old with short black hair and wearing a black and white jacket and dark pants. The officers put out a flash message of the offender's description, the location of the offense, and what had occurred.

¶ 7    Officers Joseph Smith and Sandra Threatt responded to a radio call of a battery at 3822 West 76th Street at 10:15 p.m. where they observed Gerardo Cortina bleeding from his head. They then called for an ambulance. Cortina told the officers he received his injuries two blocks away. Officer Smith heard the flash message about the homicide and realized that Cortina fit the description, and his house was approximately three blocks from J.R.'s residence. Officer Smith notified the police dispatch that he had a possible offender. Cortina was transported to Holy Cross Hospital. R.R. later observed Cortina at the hospital, but R.R. did not identify Cortina as the offender. After he was treated, Cortina was taken to Area One for questioning in the early morning hours of November 23, 2000.

¶ 8    Detective Ernest Turner was assigned to investigate J.R.'s murder. He viewed the scene and observed the victim's body on the floor with a knife in her neck and her pants and underwear pulled down. At Area One, Detective Turner advised Cortina of his rights and Cortina became "very combative and said that he didn't want to talk." Cortina asked for a cigarette and some time to think about what happened. When Detective Turner next spoke with Cortina, he told the detective that he did not know anything and he had been with defendant at defendant's house.

¶ 9    Officers subsequently brought defendant to Area One and Detective Turner spoke with defendant. The detective asked defendant if he had been with Cortina and defendant answered that they had been drinking in defendant's basement with defendant's cousin.

¶ 10    Later, Detective Jean Romic spoke with Cortina. Initially Cortina said he did not remember anything. Subsequently, Cortina told the detective that he and defendant went to the victim's house and while defendant entered Cortina waited in the front as a lookout. Defendant exited the house about 10 to 15 minutes later and said they needed to get out of there.

¶ 11    Detective John Posluszny interviewed defendant with Detective Martin McDonnell, who advised defendant of his *Miranda* rights. Defendant agreed to speak with them and gave a statement implicating himself in the crime. Defendant told them that he went to the victim's house with Cortina and Cortina pushed J.R. down while defendant looked for valuables. Defendant saw J.R. lying on the floor with Cortina on top of her.

¶ 12    Detective David Kowalski also spoke with defendant. During that interview, defendant repeated his confession but said that he may have touched one of the knives in the kitchen and he took a change purse from the house. Later that afternoon, defendant told Detective Kowalski that he brought his BB gun from home and gave it to Cortina before going to the victim's house. When J.R. answered the door, defendant said that Cortina pointed the BB gun at her and told her to get down. When J.R. did not comply, Cortina pushed her down. Defendant said he tripped over something in the kitchen and he might have accidentally touched J.R.'s arm. Defendant told the detective that J.R. was in a pool of blood with her pants and underwear pulled down and she looked dead. He took the BB gun home and hid it in a hearing vent, where it was later retrieved by Detective Kowalski.

¶ 13     ASA Leanna Rajk arrived at Area One that afternoon and spoke with defendant around 3:30 p.m. with Detective Turner present. Defendant told her that he pushed J.R. down and sexually assaulted her, but he denied knowing about her murder. He saw the knife in her neck but said he did not know how it happened. ASA Rajk spoke with defendant the morning of November 24, 2000, and defendant agreed to memorialize his statement on videotape.

¶ 14     In his videotaped statement, defendant recounted that on November 22, 2000, Cortina came over around 6 p.m. and they started drinking a type of "Mexican tequila or something like that." When Cortina was in the restroom for a long time, defendant checked on him and saw that Cortina was bleeding from the back of his head. Defendant told Cortina to go home and Cortina left. When defendant's mother came downstairs and saw the blood and noticed that defendant "was kind of drunk," she got mad at him for drinking and poured the rest of the liquor on him. Defendant became mad, left the house, and decided to make some money to buy some liquor. He returned home and got his BB gun. He walked around the block looking for a car radio, cell phone, or someone with anything he could try to get. As he walked past the victim's residence, he noticed "the lady" watching television inside the house and figured she was an "easy target" because she was old and would not fight back or give him any problems.

¶ 15     Defendant went to the side door and rang the doorbell. When J.R. answered the door, she did not open it all the way and defendant "charged" into the house. Defendant said J.R. reacted as though "she had a lot of money in there, like a lot of gold or something," and he figured there was something he could use. He told the woman to get down on the floor, but she did not comply. Since she was not afraid of the BB gun, defendant looked around for rope to tie her up or tape to tape her mouth. Instead, defendant found a knife and pointed it at her throat, but she continued to struggle. Defendant saw a couple scratches on her neck from where he had pressed

the knife. When he realized J.R. was not scared, he pushed her to knock her down and he fell on top of her. When they fell, the knife went slightly into her neck. Defendant said that the woman's face looked scared and she was suffering. She was bleeding and defendant thought she was dying. Defendant then pushed the knife all the way through her neck.

¶ 16    Defendant then realized he had done something bad and would get caught. He started thinking he would never be with a woman again. He then pulled down her pants and started to sexually assault her. He stated that he did not have an erection but touched himself to get an erection. While he was sexually assaulting her, he also inserted his index finger into the victim. His erection lasted only five seconds and he stopped when he saw blood. Defendant started searching back bedrooms for jewelry and money, but did not find anything. He took a green liquor bottle from the refrigerator and $4 or $5. When he started to unplug the television, he heard someone come into the house and "the old man" saw him. He pushed past the man, ran out of the side door and left.

¶ 17    When defendant arrived home, his mother asked how he got blood on his shirt. He told her it was from when Cortina fell. He gave her the shirt and did not know what happened to it. Defendant stated that he previously implicated Cortina because he thought Cortina had implicated him. He said he was telling the truth and wanted to take responsibility.

¶ 18    Dr. John Scott Denton testified that he performed J.R.'s autopsy. She died from a stab wound to her neck which severed her jugular vein and cut the carotid artery in half. The manner of death was homicide. J.R. also suffered four injuries to her vagina, including a laceration of the vaginal lining and a bruise with some scraping of the back of the vaginal opening. He observed a large amount of bleeding associated with these injuries and were consistent with an individual

forcing his penis and finger into her vagina. Dr. Denton stated that J.R. would have only lived for one or two minutes after the knife went through her jugular vein and carotid artery.

¶ 19    After the State rested its case, the defense moved for a directed finding, which was denied. In his defense, defendant presented the testimony a latent print examiner and she testified that none of the fingerprints recovered from J.R.'s home matched defendant.

¶ 20    Following deliberations, the jury found defendant guilty of first degree murder, aggravated criminal sexual assault and home invasion. At the subsequent sentencing hearing, the trial court held that defendant was death eligible. The parties presented evidence in aggravation and mitigation. In aggravation, R.R. read his victim impact statement into the record. The State then entered victim impact statements from three of J.R.'s nieces into the record.

¶ 21    Defendant presented testimony from multiple character witnesses in mitigation, including his father, three of his siblings, a cousin and a friend. Sheena Woodard testified as a mitigation specialist with the State Appellate Defender's office. She presented the mitigation report prepared in defendant's case. She interviewed approximately 25 people for the report, including family and friends. She also reviewed several documents, including defendant's Chicago public school records, Cermak health records, his court file, and his Cook County jail records. Woodard visited defendant in jail 24 times and spoke with guards at the jail. She noted that guards told her that defendant was "a good kid," and they did not "get a lot of trouble" from him.

¶ 22    Woodard's 2009 report detailed defendant's life based on Woodard's interviews and the documents she reviewed. Defendant's parents were born and married in Mexico. Defendant's three older siblings were born in Mexico before defendant's father moved to the United States in 1978. The family settled in Chicago by the time defendant was born in 1982. His parents became

permanent legal residents in 1986. In 1987, defendant's father purchased a two-flat home in the Back of the Yards neighborhood.

¶ 23    The Back of the Yards neighborhood was "notorious for gang infiltration, substance abuse, and racial discord." Defendant was exposed to acts of violence and substance abuse from a young age. His older brothers reported being stopped by the police without cause. His oldest brother joined a gang but attempted to "shield" defendant from the negatives of the community. His other brother avoided gang affiliation by being active in athletics. His older sister acted as parent while their parents were gone from the home. She prepared meals, disciplined, and cared for defendant.

¶ 24    In 1995, the family relocated to a new home on the 3600 block of West 77th Place. The move was made in part because defendant's parents were concerned about defendant following his oldest brother into a gang. His parents were unskilled laborers and spoke very little English. They were mostly illiterate in Spanish. Defendant's father had been employed as a Red Lobster line cook for over 20 years. His mother had worked numerous factory line jobs since moving to Chicago. His older sister earned her bachelor's and master's degrees from the University of Illinois. His oldest brother was employed as an operations manager while his other brother was employed as a truck driver. All of his older siblings were in long term relationships with children. Defendant's younger sister was five years old at the time of defendant's arrest.

¶ 25    Defendant's adolescent years from 1991 to 1996 were "pivotal" in his development. In 1991, his older sister left the home to attend college, and defendant had an "extremely difficult time accepting" her leaving. Later, when he was 13 years old, defendant had a difficult transition when the family moved from the Back of the Yards neighborhood and was "devastated" to change schools and leave his friends. In 1996, defendant's oldest brother was arrested on a drug

case in Texas. He pled guilty, served his sentence in federal prison, was released in 1998, and returned to Chicago. During this time, defendant began drinking alcohol, smoking marijuana, and skipping classes.

¶ 26    While gang activity was present in the family's new neighborhood, it was "much more limited." Gang recruitment was "elevated" at Bogan High School and defendant was approached by gang members encouraging him to join. Defendant withdrew from high school two years before his arrest and worked several minimum wage jobs. Defendant began spending most of his free time with Cortina, a known Latin King. Defendant's parents did not like Cortina and attempted to deny Cortina access to the family home. Defendant was not held accountable for violating his rule. In general, there was a lack of accountability and discipline in the home while defendant's sister was at school and his brother was in prison.

¶ 27    Defendant had one prior conviction for burglary of an automobile and had received 18-months' probation. While in the Cook County jail, defendant obtained his general equivalency degree (GED). He was 18 years old at the time of his arrest in November 2000. While in the county jail, he had received over 450 visits from family and friends. His parents and two oldest siblings had visited every week for the nine years he was in jail. He regularly called and wrote his family and friends. The guards offered "positive feedback on his character, demeanor, and behavior." Defendant remained unaffiliated with a gang while in jail. He was recruited to participate in a Mexican heritage program in the jail. Woodard concluded her report by observing that she found defendant's "maturity and insightfulness" to be "rare" and he "maintains a strong quality of genuine openness."

¶ 28    At the conclusion of the hearing, the trial court declined to impose the death penalty and sentenced defendant to natural life for first degree murder, 30 years' imprisonment for aggravated criminal sexual assault, and 30 years' imprisonment for home invasion.

¶ 29    Defendant raised several issues on direct appeal, including that: (1) the trial court erred in denying his motion to quash arrest and suppress statements because defendant was arrested before the existence of probable cause; (2) the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt because it did not establish that J.R. was alive at the time of the sexual assault; and (3) the trial court abused its discretion in sentencing defendant to a term of natural life. This court affirmed defendant's convictions and sentence. *Gomez*, 2011 IL App (1st) 092185, ¶ 96.

¶ 30    In April 2013, defendant filed his initial *pro se* postconviction petition, alleging multiple claims of ineffective assistance of trial counsel. The trial court summarily dismissed defendant's petition as frivolous and patently without merit. On appeal, defendant's appellate counsel filed a motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), which this court granted. The court then affirmed the judgment of the trial court. *People v. Gomez*, No. 1-13-2356 (2016) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 31    Defendant filed his *pro se* motion for leave to file a successive postconviction petition in November 2022. In his motion, defendant argued that his natural life sentence without parole with a consecutive sentence of 60 years violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) as applied to him because the trial court failed to take into account the hallmark features of youth as required by *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny.

¶ 32    Defendant detailed the circumstances from his life that demonstrate he was more akin to a juvenile when he committed the crimes. First, he stated that during his teenage years, he dropped out of high school, abused drugs, was unable to obtain a driver's license due to traffic violations, and was fired from multiple minimum wage jobs. Next, he recounted that he was subjected to peer pressure and negative influence through his adolescence and teenage years, including the notorious gang activity in his old neighborhood, Back of the Yards. However, defendant alleged that gang recruitment was present at the high school he attended after his family moved. He spent most of his time with Cortina, a known gang member. His parents worked long hours and left defendant and his siblings to raise themselves. Defendant also suffered physical abuse as discipline from his parents.

¶ 33    Next, defendant asserted that his potential for rehabilitation was "well documented," and pointed to his obtaining a GED. He had no disciplinary reports while in pretrial custody. At the time of his petition, he had recently received a medium security classification. Defendant admitted that he was under the influence of drugs and alcohol when he committed the offenses. He further acknowledged that while he was the principal perpetrator, he did not plan the commission of the offense. He lacked a prior violent history and noted that his prior convictions were for defacing public property as a juvenile and felony burglary of an auto. He concluded that his conduct reflected "immaturity, impetuous decision making, vulnerability to negative influences and failure to appreciate risks and consequences."

¶ 34    In a written order, the trial court found that defendant failed to satisfy the requisite cause and prejudice test and denied him leave to file his successive postconviction petition. The court concluded that the Illinois Supreme Court in *People v. Dorsey*, 2021 IL 123010, ¶ 73, previously rejected defendant's argument supporting the cause necessary to file a successive petition. The

court further held that defendant could not establish prejudice because he previously raised a proportionate penalties challenge based on his age and rehabilitative potential on direct appeal. The court found the claim was barred by *res judicata*.

¶ 35    This appeal followed.

¶ 36    On appeal, defendant argues that he has satisfied the cause and prejudice test for filing a successive postconviction petition because he presented new, previously unavailable evidence that his 18-year-old brain was developing and he was more akin to a juvenile when he committed the offenses. The State maintains that the trial court properly denied defendant leave to file his successive petition because his sentencing claim is barred by *res judicata* and Illinois Supreme Court authority forecloses his claim.

¶ 37    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a)(1) (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Only one postconviction proceeding is contemplated under the Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23; *People v. Smith*, 2014 IL 115946, ¶ 30. Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or

her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 38 The cause and prejudice standard is higher than the normal first stage "frivolous or patently without merit" standard applied to initial petitions. *Id.* ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35 ("the cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act"). "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing of both cause and prejudice in order to be granted leave before further proceedings on his claims can follow. See *People v. Bailey*, 2017 IL 121450, ¶ 24. We review the trial court's denial of leave to file a successive postconviction petition *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 39 The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "To succeed on a proportionate penalties claim, a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community ***." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). Our supreme court

has never defined what kind of punishment constitutes "cruel," "degrading,"," or "so wholly disproportioned to the offense as to shock the moral sense of the community" because, "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 339 (2002). It is under this evolving societal standard that defendant contends that his mandatory life sentence shocks the moral sense of community.

¶ 40　　The State initially contends that defendant's sentencing argument is barred by *res judicata* because he previously argued that his sentence violated the proportionate penalties clause in his direct appeal. Defendant responds that his claim is not barred by *res judicata* because he did not assert a constitutional challenge of his sentence but instead argued that his sentence was an abuse of discretion.

¶ 41　　"The doctrine of *res judicata* bars consideration of issues that were previously raised and definitively settled by judicial decision." *People v. Montanez*, 2023 IL 128740, ¶ 103. A postconviction petitioner cannot obtain relief under the Act by reframing a previously considered claim in constitutional terms in his petition. *People v. Flores*, 153 Ill. 2d 264, 277 (1992). Such claims will be properly barred under the doctrine of *res judicata. Id.* at 278.

¶ 42　　On direct appeal, defendant argued that "the trial court abused its discretion in sentencing him to natural life in prison in light of his limited, nonviolent criminal history, age and severity of the crime." *Gomez*, 2011 IL App (1st) 092185, ¶ 85. This court reviewed the evidence presented at defendant's sentencing hearing and the trial court's findings, as well as the relevant authority applicable, including the statutory framework, in determining the appropriate sentence. *Id*. ¶¶ 86-91. After this analysis, we concluded that "[b]ased on the entire record before us and given the nature of the crime, we do not find that the trial court abused its discretion." *Id*. ¶ 92.

We found that:

> "[t]he trial court clearly weighed the aggravating factors of this case against the mitigating factors. The court noted defendant's age and lack of violent criminal history. The court also remarked on the testimony from his family members and friends that defendant was a good person. The trial court found the mitigating factors to be significant enough to preclude the imposition of the death penalty, but not enough to outweigh the aggravating factors sufficient for a sentence of natural life. While we are cognizant of defendant's age and criminal history, we cannot say the trial court abused its discretion in imposing a sentence of natural life." *Id.* ¶ 95.

¶ 43    In this case, defendant argues that our review of his previous sentencing challenge does not resolve the issue now before us, *i.e.*, new evidence about his brain development supports his argument that his sentence violates the proportionate penalties clause. The State maintains that defendant has "recast" his excessive sentence claim with the proportionate penalties clause and relies on the same facts and arguments previously raised.

¶ 44    In proceedings under the Act, the principle of fundamental fairness allows courts to relax the bar of *res judicata* by satisfying the requirements of the cause and prejudice test. *People v. Clark*, 2023 IL 127273, ¶ 45. Both elements must be satisfied for a defendant to overcome the bar of *res judicata*. *Id.* ¶ 47. Thus, if defendant can establish the requisite cause and prejudice, then the doctrine of *res judicata* does not apply to this claim.

¶ 45    The sentencing of juvenile and youthful offenders has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of

15

juvenile offenders. See also *Graham v. Florida*, 560 U.S. 48, 68 (2010), *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718, 735-36 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder." *Id*. *Miller* has since been held to apply retroactively. *Montgomery*, 136 S. Ct. at 735-36.

¶ 46    Since *Miller*, the Illinois Supreme Court has suggested similar sentencing challenges are viable for youthful offenders, *i.e.*, defendants who are young, but legal adults. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (finding that a 19-year-old defendant was not necessarily foreclosed from raising an as-applied challenge in the trial court and observing that the Act was designed to resolve such constitutional claims); *People v. Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied proportionate penalties challenge was "more appropriately raised" in a postconviction proceeding rather than on direct appeal).

¶ 47    Defendant contends that his petition established cause by his citing research on the brain development of young adults over the age of 18 that was not available at the time of his direct appeal or his initial postconviction petition. He focuses primarily on the "White Paper on the Science of Late Adolescence" (White Paper), published by the Center for Law, Brain & Behavior at Massachusetts General Hospital. Center for Law Brain & Behavior at Massachusetts General Hospital, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers* (Jan. 27, 2022). https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (last accessed Dec. 3, 2024). The White Paper reviewed "recent

scientific research establishing that these same "signature qualities of youth" extend into the period of late adolescence (ages 18-21)." *Id*. at 7. The White Paper noted that since *Miller*, more than 100 new publications have explored the brain's development throughout late adolescence. *Id*.

¶ 48    Defendant argues that the new research detailed in the White Paper "makes clear that there was [a] significant amount of scientific development" after defendant's sentencing, direct appeal, and initial postconviction petition that would relate to a court's consideration of his culpability and potential for rehabilitation. According to defendant, he has established the requisite cause because, based on this new scientific research, the sentencing court was unable to deliberate on how his brain was different from older adults and was more similar to a juvenile.

¶ 49    The reason defendant focuses on the recent research of the brain development in young adults and seeks to avoid basing his claim on the *Miller* line of cases is because Illinois courts have consistently held that *Miller* and other age-related claims do not constitute cause. A defendant cannot establish the necessary cause because our courts have long recognized the differences between juvenile and young adult offenders. See *People v. Dorsey*, 2021 IL 123016, ¶ 74; *People v. Clark*, 2023 IL 127273, ¶¶ 92-94; *People v. Moore*, 2023 IL 126461, ¶ 42; *People v. Hilliard*, 2023 IL 128186, ¶ 28.

¶ 50    In *Dorsey*, a juvenile offender sought leave to file a successive postconviction petition, challenging his 76-year aggregate prison sentence based on *Miller*. The *Dorsey* court held "that *Miller*'s announcement of a new substantive rule under the eighth amendment [did] not provide cause for [the] defendant to raise a claim under the proportionate penalties clause." *Dorsey*, 2021 Il 123016, ¶ 74. "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to

2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.*

¶ 51 Following *Dorsey*, Illinois courts have continued to hold that sentencing claims based on youth are not novel and do not support a finding of cause. In *Clark*, the supreme court considered the proportionate penalties claim of a 24-year-old defendant suffering from mental health issues. *Clark*, 2023 IL 127273, ¶ 1. Applying the cause-and-prejudice test, the supreme court found that the defendant could not establish cause because case law was clear that the new rule set forth in *Miller* " 'does not provide cause for a defendant to raise a claim under the proportionate penalties clause' in a successive postconviction petition." *Id.* ¶ 92 (quoting *Dorsey*, 2021 IL 123010, ¶ 74). In applying *Dorsey* to young adult offenders, the *Clark* court observed that "Illinois courts were also aware that 'less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development.' " *Id.* ¶ 93 (quoting *Haines*, 2021 IL App (4th) 190612, ¶ 47). The court found that the defendant " 'had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause' when he filed his previous postconviction petitions." *Id.* (quoting *People v. Haines*, 2021 IL App (4th) 190612, ¶ 49). The supreme court concluded that, "citing the *Miller* line of cases does not satisfy the 'cause' prong of the cause-and-prejudice test for raising a proportionate penalties claim in a successive postconviction petition, as *Miller*'s unavailability does nothing to explain why defendant neglected to raise the proportionate penalties clause claim in his prior postconviction proceedings." *Id.* ¶ 94; see *Moore*, 2023 IL 126461, ¶ 42 ("As *Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced in [the defendants'] proposed successive postconviction petitions."); *Hilliard*, 2023 IL 128186, ¶ 28 (recognizing its holding in *Moore* that *Miller* protections do not apply to

discretionary sentences or adults).

¶ 52    In *Haines*, the defendant sought leave to file a successive postconviction petition challenging his 55-year sentence for a first degree murder he committed when he was 18 in violation of the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution based on *Miller* and *Harris*. *Haines*, 2021 IL App (4th) 190612, ¶ 1. The Fourth District found that Illinois courts had recognized as-applied claims under the proportionate penalties clause years before the defendant's initial postconviction petition. *Id.* ¶ 46. Further, the *Haines* court observed that "decades before *Harris*, Illinois case law held that the proportionate-penalties clause required the sentencing court to take into account the defendant's 'youth' and 'mentality.' " *Id*. ¶ 47. The reviewing court concluded that the defendant "had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause" when he filed his prior postconviction petition and found that the defendant had not satisfied the cause prong of the cause and prejudice test. *Id*. ¶ 49. The *Haines* court further reasoned:

> "To be sure, *Harris*, issued some 10 years after the initial postconviction proceeding, would have made it easier for defendant to raise his claim. But, again, the question is not whether subsequent legal developments have made it easier to raise the claim. Rather, the question is whether, at the time of the initial postconviction proceeding, Illinois law provided the tools with which to raise the claim. Despite the nonexistence of *Harris*, the legal basis of defendant's present proposed claim was reasonably available at the time of the initial postconviction proceeding." (Internal citations omitted.) *Id*.

¶ 53    Similarly, in *People v. Kuehner*, 2022 IL App (4th) 200325, the defendant entered an

open plea for attempted first degree murder and home invasion, committed when he was 17 years old, and received a sentence of 35 years. He sought leave to file a successive postconviction petition alleging, in part, that his sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. *Id*. ¶¶ 1,4. The defendant argued that he established cause because the authority on which he based his sentencing claim was not previously available to him and pointed to legislative changes in Illinois in 2014, 2016, and 2019 that he contended demonstrate a societal shift toward more lenient treatment of juvenile offenders. *Id*. ¶ 100.

¶ 54    The *Kuehner* court followed the reasoning in *Haines* and found that the defendant could not show cause because he was not prevented from challenging his sentence in a previous postconviction petition. The reviewing court observed that the defendant had "the necessary tools to construct an as-applied, proportionate penalties claim" when he filed his direct appeal, initial postconviction petition, and an amended postconviction petition. *Id*. ¶ 106. The court noted that the recent statutory amendments "would have made it easier for him to prove his claim, but he was not foreclosed from bringing that claim earlier." *Id*.

¶ 55    Despite this clear precedent, defendant asserts that these cases have not foreclosed his claim for relief. According to defendant, his reliance on alleged new evidence, namely the White Paper, that did not exist at the time of his sentencing, direct appeal, or initial postconviction satisfies the necessary cause. He further contends that even if he could have relied on the proportionate penalties clause to challenge his sentence, he did not have factual basis to support his claim, specifically the scientific research on brain development for young adults to show that his brain was more like a juvenile.

¶ 56    Our supreme court has consistently held that the "lack of precedent for a claim differs

from cause for failing to raise an issue, and a defendant must raise the issue, even when the law is against him, in order to preserve it for review." *People v. Guerrero*, 2012 IL 112020, ¶ 20. As the *Haines* court observed, Illinois courts "have long been aware that less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development." *Haines*, 2021 IL App (4th) 190612, ¶ 47.

¶ 57    We find defendant's proportionate penalties claim falls under *Miller* because he is using its reasoning to demonstrate the evolving standards of sentencing for young adult offenders. His new evidence is research on the brain development of young adults which was in part kickstarted by *Miller* and the line of cases extending its reasoning to young adult offenders. See *Thompson*, 2015 IL 118151, ¶¶ 43-44; *People v. Harris*, 2018 IL 121932, ¶ 48.

¶ 58    Further, we are not persuaded by defendant's assertion that this new research on brain development is analogous to cases involving coerced confessions. This research is not akin to evidence of police corruption and abuse of a defendant. Those defendants have presented evidence of coercion and abuse by police officers. See *People v. Blalock*, 2022 IL 126682, ¶ 40 (finding that the defendant satisfied cause when he claimed his confession was coerced but he did not and could not have discovered evidence of a "pattern and practice of police brutality" before his initial postconviction petition). In contrast, defendant simply argues that the research itself is evidence of his brain development, but he has not provided any evidence about how this research correlates to his own brain development and what evidence the trial court was unable to consider as it related to his own actions. As discussed above, the trial court took his age, criminal history, family life, and actions into account in fashioning the appropriate sentence. Thus, defendant had the tools to raise his proportionate penalties claim prior to the existence of this research on young adult brain development and the decisions in *Thompson* and *Harris*. See

21

*Haines*, 2021 IL App (4th) 190612, ¶ 49. Accordingly, defendant cannot establish the requisite cause necessary to both allow leave to file his successive petition and avoid the bar of the doctrine of *res judicata*. The trial court properly denied defendant leave to file his successive postconviction petition.

¶ 59    Since our ruling on cause disposes of the case, we need not address the issue of whether defendant adequately stated a *prima facie* showing of prejudice. *Moore*, 2023 IL 126461, ¶ 42.

¶ 60    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 61    Affirmed.